**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**G. K. TURNER ASSOCIATES, Respondent.**

**No. 71–1070.**

United States Court of Appeals, Ninth Circuit.

March 21, 1972.

J. Rosenbaum (argued), Arnold Ord-man, General Counsel, Dominick L. Man-oli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Warren M. Davison, Deputy Asst. Gen-

eral Counsel, Washington, D. C., for petitioner.

J. Richard Thesing (argued), of Littler, Mendelson & Fastiff, San Francisco, Cal., for respondent.

Before WRIGHT and CHOY, Circuit Judges, and CROCKER, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

This case is before us upon the application of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C. § 151 et seq.), for enforcement of an order issued against G. K. Turner Associates ("Turner") on June 19, 1970. The Board's decision and order are reported at 183 NLRB No. 81.

The order directed the employer to bargain with the International Association of Machinists and Aerospace Workers, District Lodge No. 93. Turner is engaged in the manufacture and non-retail sale of technical laboratory instruments in Palo Alto, California. In a representation election on February 25, 1969, five of Turner's seven production and maintenance employees voted for the union. Turner filed timely objections directed to the union's pre-election conduct.

After conducting an administrative investigation, the Regional Director concluded that the company's objections raised insufficient factual issues to justify an evidentiary hearing. The Board adopted his recommendations and certified the union, and the employer thereupon sought judicial review by refusing to recognize or bargain with the certified union.

The company alleged facts which, if true, would indicate that union misrepresentations affected the outcome of the election. On the present state of the record, substantial and material factual issues remain unresolved. We deny enforcement of the Board's order, which found that the company's refusal to bargain violated Section 8(a) (5) and (1) of the Act, and we remand for an evidentiary hearing on the company's objections.

## I.

■ Turner contends that the Board's official Notice of Election misled and confused its employees. The notice read:

"You Have the Right under Federal Law

• To self-organization

• To form, join or assist labor organizations

• To bargain collectively through representatives of your own choosing

• To act together for the purposes of collective bargaining or other mutual aid or protection

• To refrain from any or all such activities"

The notice implies incorrectly that an employee has an absolute right to decline to join a union. Compare the language in Section Seven of the Labor Act:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities *except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title.*" (Emphasis supplied.)

The Board puts forward no satisfactory explanation for its omission of the underlined qualification from its official notice, but offers only this excuse: "The Notice does not purport to cover

---

* Honorable M. D. Crocker, United States District Judge for the Eastern District of California, sitting by designation.

all eventualities or present an extensive discussion or interpretation of the Act."

The record in this case includes a copy of a notice posted pursuant to a settlement agreement in another case. That notice, as does the Notice of Election, contains a brief declaration of employees' rights under the Labor Act. Unlike the Election Notice posted in the case before us, this settlement agreement notice avoids the inexplicable omission of the union security clause qualification:

"The National Labor Relations Act gives all employees these rights:

. . . . . .

To refuse to do any or all of these things (*unless the union and employer enter into a lawful union security clause requiring employees to join the union*)." (Emphasis supplied.)

We see merit in the company's contention that the Election Notice should contain a clause mentioning the significant qualification of the broad Section Seven right to refrain from union activity. If a worker with antiunion sentiments believed, after reading the notice, that he would not have to join a union regardless of the outcome of the election, he might decline to take any part in it. On the other hand, if he knew he could be forced to become a member if the union prevailed, he likely would not only vote himself but would also try to persuade other employees to his views.

The Board's official notice, as written, although potentially misleading, does not provide a basis for setting aside a representation election. N.L.R.B. v. W. R. Ames Co., 450 F.2d 1209 (9th Cir. 1971). Nonetheless, we believe the Board might well alter its form of notice hereafter to provide a more accurate and fairly balanced summary of employee rights under the Labor Act.

## II.

The more serious company objections concern misrepresentations allegedly made by union agents during an informal discussion with the employees five days before the election. Two employees signed sworn declarations concerning the substance of the conversations at this casual meeting. The company contends that the union representatives made seven separate materially false statements.

The Regional Director reported that the union agents denied making most of them. It appears that only the two employees who gave the declarations remembered hearing the alleged misrepresentations. At least one of the two was strong in his anti-union beliefs. Since the Board refused to hold an evidentiary hearing at which credibility issues and factual conflicts could be resolved, however, we are bound on this record to accept as true all of the company's versions of the conversations.

The Board determined that the challenged statements, even if fully credited, could not have materially affected the election outcome. We disagree.

The courts review election conduct to determine whether it inhibited the employees' free choice in selecting their bargaining representative. Gallenkamp Stores Co. v. N.L.R.B., 402 F.2d 525 (9th Cir. 1968). Recognizing that some hyperbole is inherent in an election campaign, we have held that an election will be set aside only where one party has misrepresented material facts, the other had no opportunity to reply, and the resulting distorted presentation significantly impaired the election process. N.L.R.B. v. Winchell Processing Corp., 451 F.2d 306 (9th Cir. 1971).

The impact of a misstatement can be gauged in part by considering (a) whether the employees had independent knowledge of the misrepresented fact so they could effectively evaluate the propaganda, and (b) whether the party making the statement had a special knowledge of the facts which made its words sound authoritative. N.L.R.B. v. Winchell Processing Corp., supra at 309; S. H. Kress & Co. v. N.L.R.B., 430 F.2d 1234, 1239 (5th Cir. 1970).

### III.

#### 1. *Company Profits.*

 A union agent allegedly told employee Bradley the company had earned $500,000 the previous year, information which, he said, came from stock market reports.

Turner's president by affidavit stated that the company kept its profit figures confidential, no market report had given them, and the earnings for the year in question were much less than $500,000.

The company conducted a question and answer session with its workers the day following their conversations with the union agents. One employee asked president Hainsworth about the firm's profits. He replied that the figures could not be publicized.

The Regional Director's Report dismisses this union misstatement by remarking that the employer's financial status had not been a major issue in the election campaign. The Report also attempts to minimize the impact of the misinformation by pointing to the opportunity given president Hainsworth to set the record straight.

No factual basis appears for the Regional Director's conclusion about employee disinterest in the employer's profits. And the company president cannot realistically be said to have received an opportunity to respond to the union, since he learned of the union's reference to company profits only after the election had been held.

 Misrepresentations about company profitability can be material, since the extent to which employees share equitably in the products of their labor may be of great interest to them. See, e. g., Tyler Pipe & Foundry Co. v. N.L.R.B., 406 F.2d 1272 (5th Cir. 1969); The Halsey W. Taylor Co., 147 N.L.R.B. 16 (1964).

Upon remand the Trial Examiner should consider both whether the union agent in fact provided false information about profits and whether, considering all the circumstances, the statement would likely have had a real impact on the election.

#### 2. *Company Profit Sharing Plan.*

When employee Baker mentioned Turner's profit sharing plan, a union agent allegedly responded:

"Just try and get your money out. There is nothing in writing to make the Company give it to you. If they don't want to give you the money, they don't have to and there is nothing you can do about it."

The company had earlier distributed to the employees written details about the plan and discussed it with them. Despite this, employee Baker's affidavit expresses concern about possible loss of his contribution to the plan. This casts some doubt upon the Regional Director's assumption that the employees knew the facts about the plan and hence could evaluate the propaganda effectively.

The Trial Examiner should inquire into the extent of the employees' independent information about the plan. He might also discover why Baker, if he was genuinely concerned about his rights in the plan, did not raise the issue during the company's question and answer session the next day.

#### 3. *Sympathy Strikes.*

A union agent told Baker that there was no such thing as a sympathy strike. The Regional Director dismissed this falsehood, saying, "No evidence was submitted indicating that the union's agent's answer to the question regarding sympathy strikes was contrary to the union's intent."

The company pointed out that a sister local of this union was then litigating before the Board over fines imposed on workers who refused to engage in a sympathy strike. The Trial Examiner should determine whether the evidence justifies the Regional Director's bald conclusion that the union had not misrepresented its policies on sympathy strikes.

#### 4. *Union Fines.*

 Bradley asked whether the union could fine its members for missing meetings. A union representative replied that state law forbids fining members who do not attend union meetings. In fact, nothing in California or federal law bars such fines.

Although he recognized the statement was false, the Regional Director recommended overruling the objection because the Labor Act prohibits unions from causing an employee's discharge for failure to pay such a fine. This implies that union fines are not enforceable. In fact, a local within District Lodge No. 93 has in the recent past obtained a state court judgment to collect a fine. The Board upheld it. International Association of Machinists and Aerospace Workers, AFL–CIO, Local Lodge No. 504 (Arrow Development Co.), 185 N.L. R.B. No. 22. Hence the representation was both false and significant.

#### 5. *Union Threats.*

In answer to an inquiry about the result of a company rejection of proposed union contract terms, a union agent said, "If they don't agree, we've got ways of using muscle," and simultaneously flexed his arm muscle. While we doubt that this was meant or received as anything but a reference to legitimate. economic weapons, the Trial Examiner should develop the record on this point.

#### 6. *Supervisors.*

The union promised the employees that it could force out any supervisor whom they did not like. Although this most likely refers to normal grievance procedures, the Trial Examiner could well inquire into the union intent.

#### 7. *Initiation Fee Waivers.*

 A union promise to waive initiation fees for unit employees does not constitute improper inducement, and the contrary authority cited by respondent, N.L.R.B. v. Gilmore Industries, 341 F.2d 240 (6th Cir. 1965), is not persuasive. It rests upon Lobue Brothers, 109 N.L. R.B. 1182 (1954), which had prohibited fee waivers if they were expressly conditioned on the outcome of the election.

After *Gilmore Industries* was decided, the Board rejected the artificial *Lobue* distinction between an unconditional waiver and one premised on union victory. The Board said, "Whether expressly told so or not, an employee must recognize that as a practical matter the waived or reduced initiation fee can become of value to him only if the union wins the election." N.L.R.B. v. DIT– MCO, 428 F.2d 775, 779 (8th Cir. 1970). The *DIT–MCO* court held that the Board's new policy was within its discretionary power to regulate election conduct. We agree.

### IV.

In their cumulative impact, the union's misrepresentations could have significantly distorted the election process. At least we cannot say on the present state of the record that they did not do so.

The Board's bargaining order will not be enforced because the company's objections create substantial and material unresolved factual issues about matters that could have significantly affected the outcome of the election. The company was entitled to an evidentiary hearing on its objections. *See, e. g.,* N.L.R. B. v. W. R. Ames Co., 450 F.2d 1209 (9th Cir. 1971); N.L.R.B. v. Harrah's Club, 403 F.2d 865 (9th Cir. 1968); Sonoco Products Co. v. N.L.R.B., 399 F. 2d 835 (9th Cir. 1968).

Enforcement denied.