**ARGUS OPTICS, a Division of Argus, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 74–1860.**

United States Court of Appeals, Sixth Circuit.

May 5, 1975.

Stewart J. Katz, Keller, Thoma, Toppin & Schwarze, Detroit, Mich., for petitioner.

John S. Irving, Patrick Hardin, Elliott Moore, Peter G. Nash, Deputy Gen. Counsel, National Labor Relations Board, Peter J. Carre, Washington, D. C., Leonard Page, International Union, UAW, Detroit, Mich., for respondent.

Before WEICK, McCREE and ENGEL, Circuit Judges.

McCREE, Circuit Judge.

This petition by Argus Optics, a Division of Argus, Inc., for review of an order of the National Labor Relations Board, and the cross-application for its enforcement by the Board present for our consideration the question whether there is substantial evidence in the record as a whole to support the Board's

determination that the company's refusal to bargain with its employees' certified bargaining agent was an unfair labor practice in violation of sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (1). The company also requests us to determine whether the Board erred in refusing to order an evidentiary hearing to permit a determination whether the election results should be invalidated because the union, during the campaign, materially misrepresented the company's profitability.

 We hold that an evidentiary hearing is required to permit a determination whether a letter sent by the union to Argus Optics employees misrepresented the profitability of the plant; whether a union representative made the same misrepresentation at a union meeting; and, if the misrepresentations were made, whether they, either alone or in conjunction with other alleged union misconduct, had a significant impact on the election. Accordingly, we deny the Board's cross-application for enforcement, grant the petition for review, and remand the case for further proceedings.

This case arises from a hotly contested representation election held on April 6, 1973, to determine whether the production and unskilled maintenance employees of Argus Optics, located in Ann Arbor, Michigan, desired to be represented by the United Automobile, Aerospace and Agricultural Workers of America (UAW). The union won the election by the narrow margin of 55–47.

Shortly thereafter, on April 13, 1973, Argus Optics filed with the National Labor Relations Board timely objections to the conduct of the election. Because the objections presented to the Board in the representation proceedings are identical to those urged by Argus Optics in this appeal, we quote them in full:

1. On or about April 2, 1973 and April 5, 1973, the UAW materially misrepresented to the employees that Argus Optics was "making money"

when in fact Argus Optics was losing money.

2. In a letter mailed to employees on or about April 2, 1973, the UAW materially misrepresented the following:

(a) That the fringe benefits in all UAW contracts are $1.50 per hour minimum to a maximum of $1.85 per hour.

(b) That prescription drugs are approximately $5.18 per month is [sic] on top of the $1.85 per hour benefit.

(c) That all fringe benefits are paid for by the Company.

3. In a letter mailed to employees on or about April 2, 1973, the UAW restrained and coerced employees by stating that if the Employer's employees did not vote for the Union they would receive pay cuts, few benefits, low wages, and termination (fired).

4. In a letter mailed to employees on or about April 2, 1973, the UAW materially misrepresented the fact that hundreds of Argus Optics' employees had received pay cuts, few benefits, low wages and termination and materially misrepresented the fact that the foregoing would not have occurred had the employees voted for the UAW in the last election. The UAW also materially misrepresented the fact that the young workers presently employed by Argus Optics would not be employed had the UAW won the last election.

5. In a letter mailed to employees on or about April 2, 1973, the UAW materially misrepresented the fact that all negotiated improvement and fringe benefits are paid for by Employers.

6. In a letter mailed to employees on or about April 2, 1973, the UAW materially misrepresented to the employees that Employers pay the employees' union dues.

7. In a letter mailed to employees on or about April 2, 1973, the UAW materially misrepresented the fact

that UAW dues cannot be increased except as shown in the chart attached to the April 2, 1973 letter.

8. The UAW, through its agents, threatened and coerced employees into voting for the Petitioner [the UAW].

9. Employees threatened and coerced other employees into voting for the UAW.

In response to the objections, the Regional Director conducted an investigation in which both the union and the company were afforded only a limited opportunity to present evidence. He issued his Report and Recommendations on Objections to Election on June 15, 1973, in which he advised the Board to dismiss the objections. Argus Optics then filed Exceptions to the Regional Director's Report and Recommendations on Objections to Election and requested review and appropriate relief from the Board. On October 5, 1973, the Board issued its Decision and Certification of Representative in which it adopted the findings, conclusions and recommendations of the Regional Director and certified the UAW as the exclusive bargaining representative of the Argus Optics employees in the unit.

Thereafter, on October 19, 1973, Local 985 of the UAW wrote to Argus Optics requesting the commencement of collective bargaining negotiations. The employer responded by informing the union that it did not believe that the election had been properly conducted and that in order to obtain judicial review of the Board's decision it was refusing to bargain.

Subsequently, Local 985 filed an unfair labor practice charge alleging that the company's refusal to bargain constituted a violation of sections 8(a)(5) and (1) of the National Labor Relations Act. On December 5, 1973, the Regional Director issued a Complaint and Notice of Hearing and, after the employer had filed its Answer to Complaint and Notice of Hearing, the General Counsel for the Board filed Motions to Transfer Case to and Continue Proceedings before the Board and for Summary Judgment. Argus responded by filing an Answer in Opposition to General Counsel's Motion for Summary Judgment and repeated the contentions it had already raised in the exceptions it had filed to the Regional Director's Report and Recommendations on Objections to Election. On May 28, 1974, the Board issued its Decision and Order, reported at 210 NLRB No. 124, in which it summarily dismissed the employer's contentions, determined that the employer had violated sections 8(a)(5) and (1) of the National Labor Relations Act, and ordered, *inter alia*, that the employer bargain with Local 985.

This petition for review and the cross-application for enforcement of the Board's order followed. In granting the petition for review to permit an evidentiary hearing to be held, we are concerned primarily with the effect on the election of the union's claimed misrepresentation that Argus Optics was making substantial profits when, in fact, it had been operating at a loss. The pertinent representations occurred twice during the campaign, once in a letter sent to employees on April 2, 1973 and once at a meeting held on April 5, the day before the election.

Although the April 2 letter mentions the profitability of the employer only once, we quote the letter in its entirety because it forms the basis of the employer's first seven objections to the fairness of the election campaign. The letter states:

[Letterhead of International Union, United Automobile, Aerospace & Agricultural Implement Workers of America UAW]

April 2, 1973

TO: All Argus Optics Employees:
Fellow Workers:

*DON'T OVERLOOK THE FACTS!*
The management stated in a letter dated March 27, 1973, that the UAW is back for the "third" time.

If, in the first election, the workers had voted for the UAW to represent them; they *WOULD NOT* have been terminated (fired) and not one of the young workers would be employed there at Argus today. And, if those of you voting on April 6 *DO NOT* vote "YES" for the UAW, many, if not all of you, will eventually receive what hundreds (yes, that's right hundreds) have received from Argus in the past—pay cuts, few benefits, low wages and termination. Individually you cannot do one thing about it to the powerful boss, you need the UAW!

The boss stated they provide 15% of your wages in fringe benefits. BIG DEAL! Your average wage is approximately $3.01 per hour; 15% of $3.01 is .45¢ [sic] for fringe benefits. This is a disgrace and inhumane to all of you. The fringe benefits in UAW contracts are $1.50 per hour minimum to a maximum of $1.85 per hour. Prescription drugs of approximately $5.18 per month is on top of the $1.85 per hour in benefits—ALL PAID FOR BY THE COMPANY.

*AGAIN, YOU NEED THE UAW*

The company is playing the numbers game with you. They stated that in 1972 the fringe benefits were $119,000. Now you figure it out yourself . . . 45¢ per hour times 2080 hours, which is full-time . . . equals $936.00. When you multiply $936.00 by 123 employees, you get $115,128.00. Here's the catch—There were only 53 eligible voters at election time last year, and when did the company reach employment of 123?

You should ask them how did they get the $119,000 figure?

Figures don't lie but "*liars*" do figure. The boss had better have every benefit itemized because that will be the FIRST question the UAW will ask.

We will keep the letter which is signed by the boss—Donald P. Hochgreve, General Manager.

When they sit at the bargaining table with the UAW, by *law* we are entitled to the data and we will "*DEMAND*" that we get the FACTS.

*YOU NEED THE UAW*

The boss is not too well informed about the UAW.

1. The initiation fees have been waived and you were notified in a long list of questions and answers.

2. You were also informed there would be *no dues* until you ratified a negotiated contract.

3. All money the UAW borrowed to win for its members on strike has been repaid in full as of TODAY and the UAW has 40 million dollars in the strike fund. We like it, we're proud of the fund, it wins for us when the boss says NO! But of course it makes the Argus boss have sleepless nights.

*THERE IS DEMOCRACY IN THE UAW!*

Twice in 35 years the membership "VOTED" (that's right voted) to increase dues to win what they knew they were entitled to from the profits . . . from Ford in 1967, a total of $40, and G.M. strike of three months, approximately $10.00 each month ($30.00)—for a total at Ford and G.M. of $70.00.

Wow! What a good invesment! On the cost of living alone it repaid all plus many, many more improvements. While this helps all small plants to negotiate the improvements, we are "*happy*" in knowing that the greedy bosses in unorganized plants such as Argus have to give the employees a "*little*" more in wages and benefits. *Argus with a profit of $1,102,000 can afford much more* [Emphasis added].

*YOU NEED THE UAW*

Finally, the boss has to supply all the money negotiated for improvements in wages and fringe benefits, but what really "makes" the boss climb the walls is that he has to supply the money for your UAW dues. It doesn't

cost—it pays to below to the UAW. (see enclosed chart)

*TRY IT—YOU'LL LIKE IT—VOTE "YES" UAW—FRIDAY, APRIL 6*

Walt Baker Phil Furman

copied/opeiu 42

/s/ WALT M. BAKER

On the same day that this letter was mailed, the union mailed a second letter that disclosed that the substantial profits referred to in the earlier mailing were profits not of Argus Optics but of its parent company, Argus, Inc. However, because the union failed to place postage on the second mailing, these letters were returned to the union and remailed on April 4 and 5. It appears that the employees did not receive the second letter until after the balloting had taken place. The employer learned of the first letter on April 6, the day of the election, at a time when it was legally impermissible to call a meeting of employees, Peerless Plywood Co., 107 N.L.R.B. 427 (1953), and physically impossible to inform employees of the alleged inaccuracies of the letter.

On election eve, the union conducted a meeting attended by approximately twelve Argus Optics employees and, according to an affidavit submitted by one employee in attendance, the following representations were among those made by union representatives:

\* \* \* \* \* \*

Baker then said that they had planned on sending all of the employees a Financial Statement concerning Argus, Inc. but they had not gotten it in the mail in time. Baker held up a piece of paper and pointed at it and said: These figures are all accurate and this is the gospel truth; we couldn't print this or hand it out if it all wasn't exactly true; and anyone could get this in writing (or something to that effect.) Baker then referred to some of the figures on the letter & made some comments about them as being accurate.

Baker then passed the letter around to all of the employees. . . . It should be noted that Baker took the letter back after all the employees read it, however I received a copy of it in the mail after the election on the following Saturday, I believe April 7, 1973.

Throughout this meeting which lasted about two hours, Baker kept referring to the letter . . . and kept emphasizing that the company's profits from our plant were "A Million— one—two." Baker said the management had lied to us enough and they were lying to us now by saying they were not making profits. Baker was almost yelling at this point, and saying the employer was lying. During this time, Baker occasionally asked Furman if that wasn't right, and Furman would say yes, and then reiterate what Baker had said.

At the end of the meeting Baker and Furman again referred to their letter . . . and emphasized the company's profits, and stated that we'd continue working under the same conditions, and it would be our own fault, if we didn't vote for the union.

\* \* \* \* \* \*

It should be noted that during the union meeting referred to above, neither Baker nor Furman made any distinction between Argus, Inc. as a whole, or the Ann Arbor plant when they referred to the profits, etc. I personally believed they were referring to the Ann Arbor plant as making the profit. When Baker said the company had lied to us, all of the employees sort of nodded their heads.

Although the report referred to in this employee affidavit does state that it is a financial report on Argus, Inc., nevertheless, if it was passed quickly from employee to employee and if the union representatives emphasized the size of the profits and not their source, it is possible that employees did not understand that the profits were those of Argus, Inc. and not of Argus Optics.

In his Report and Recommendations on Objections to Election, the Regional Director did not decide whether the first letter mailed contained a material misrepresentation of the profitability of Argus Optics and ignored the employee affidavit that stated that union representatives at the election eve meeting misled employees about the profitability of Argus Optics. Accordingly, he did not determine what impact, if any, the first letter and the statement at the meeting of the employees had on their ability to exercise their free will in the election. Instead, he made only the following findings relevant to the problem under consideration:

*Objection Allegation No. 1:*

The investigation reveals that the content of Exhibit B [the second letter] is accurate, insofar as it relates to the financial status of Argus, Inc. The Employer contends, however, that the employees were led to believe that the information contained therein referred specifically to the Argus Optics Division of Argus, Inc., which is the facility involved herein.

The investigation discloses that on March 14, 1973, Petitioner held a meeting at the hall of Local 308, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, which was open to all eligible voters. Approximately eighteen employees attended that meeting. In response to questions concerning the financial status of the Employer, a Petitioner agent indicated that it would attempt to secure a financial report but that such financial reports were usually available only on a corporation-wide basis. On April 5, 1973 Petitioner again held a meeting at the same location attended by approximately eight to twelve employees. At that meeting a Petitioner agent distributed among the employees a copy of the letter referred to herein as Exhibit B. Petitioner referred to the attachment to the letter as being a financial statement of Argus, Inc. and emphasized that the company's profits exceeded $1,000,000.

The investigation does not disclose any evidence that Petitioner, either at the above-mentioned meetings or in its correspondence of April 2, 1973, represented the statements contained in Exhibit B to be the corporate financial picture of Argus Optics Division exclusively. Rather, Exhibit B's attachment indicates as the subject, "Argus, Inc." It is this attachment to which the April 2 letter refers. There is nothing stated in that letter or attachment which would indicate that the financial report and the profit picture outlined therein referred only to Argus Optics Division. Inasmuch as the information contained in Exhibit B and referred to in Objection Allegation No. 1 is not a substantial departure from the truth, it is recommended that this objection allegation be found to be without merit. Hollywood Ceramics Company, Inc., 140 NLRB 221; Tyler Pipe Industries, Inc., 180 NLRB 880, 888–889.

The deficiency of the Regional Director's determination is apparent. He considered the impact only of the second letter—a letter that was apparently not received by the majority of employees until after the election when it could not have had any impact at all. He failed to take into consideration at all the charge of the employee who swore that union representatives at the election eve meeting had misled him into believing that Argus Optics was making the profits referred to in the report that was quickly circulated among the employees who attended. He thus failed to consider the heart of the employer's objection to the election. Accordingly, we do not know what the Regional Director would have concluded had he considered whether the first letter materially misrepresented Argus Optics' profitability, and whether the employee's charge that union representatives made a similar misrepresentation at the election eve meeting was true.

We recognize, as did the courts in Henderson Trumbull Supply Corp. v.

NLRB, 501 F.2d 1224 (2d Cir. 1974); NLRB v. G. K. Turner Associates, 457 F.2d 484 (9th Cir. 1972), and Tyler Pipe and Foundry Co. v. NLRB, 406 F.2d 1272 (5th Cir. 1969), that the profitability of a company may be an important factor in an employee's decision whether to vote for union representation.[1] "Misrepresentation about company profitability can be material, since the extent to which employees share equitably in the products of their labor may be of great interest to them." 457 F.2d at 488.

In those cases, the courts denied the Board's application for enforcement of its order requiring the employer to engage in collective bargaining and remanded the causes for an evidentiary hearing as we do here. In the *G. K. Turner Associates* case, the court, in concluding that the Board had erred in holding that the company's objections to the election were insufficient to warrant conducting an evidentiary hearing, stated:

> The more serious company objections concern misrepresentations allegedly made by union agents during an informal discussion with the employees five days before the election. . . . A union agent allegedly told employee Bradley [that] the company had earned $500,000 the previous year, information which, he said, came from stock market reports.

*Id.* at 487, 488. The Regional Director dismissed this objection, stating that the profitability of the company "had not been a major issue in the election campaign," even though there was no factual basis in the record for this conclusion, and observing that the company had had an opportunity to rebut the inaccuracy even though the company had asserted that it had not learned of the misstatement until after the election had been conducted. *Id.* at 488.

In *Tyler Pipe and Foundry Co.*, the court, in determining that the Board had erred in refusing to grant the company's request for an evidentiary hearing, rejected the Board's contention that some of the claimed false statements could not have affected the election, and that with respect to the others, the company had bypassed opportunities to respond to them. And, the court expressed its concern about the distribution of handbills that

> falsely stated, among other things, that the employees had made many millions of dollars for the Company and its stockholders, and contained strong implications that the Company was holding out on the employees.

406 F.2d at 1274.

In this case the need for a remand is even more acute because the Regional Director considered only the second letter mailed to the employees even though most of them apparently received that letter after the election and because he ignored the first letter received before the election and the employee affidavit stating that union representatives at the election eve meeting led him to believe that the Ann Arbor plant was making a profit of over a million dollars. Moreover, the truthfulness of the allegation that there was considerable employee interest in the profitability of the plant should also be considered.

In requiring a remand for the purpose of conducting an evidentiary hearing, we observe that:

> [t]he company has alleged facts which, if true, would indicate that union misrepresentations affected the outcome of the election. On the present state of the record, substantial and material factual issues remain unresolved. . . . Since the Board refused to hold an evidentiary hearing at which credibility issues and factual conflicts

---

1. In Wackenhut Corp., 1965 CCH NLRB ¶ 9166 (Case No. 24–RC–2360) (March 9, 1965), the Labor Board recognized the validity of this observation in a decision where it certified a bargaining representative that had misrepresented company profitability in campaign literature distributed three weeks before the election because the employer was permitted to make an effective reply three days before the election. In this case, of course, the employer had no opportunity to make a reply at all.

could be resolved . . . we are bound on this record to accept as true all of the company's versions of the conversations [, the timing of the union letters, and the interest of its employees in the question whether the plant was profitable].

NLRB v. G. K. Turner Associates, *supra* at 486, 487.

Enforcement is denied and the case is remanded to permit an evidentiary hearing to consider whether the union communicated false or misleading information about the profitability of Argus Optics to company employees and whether, considering all the circumstances of the election, these statements, if false, would have had a substantial impact on the employees' free choice of a representative.