NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PINKERTON'S, INC., Respondent.

No. 78–1049.

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1980.

Decided June 27, 1980.

Elliott Moore, Deputy Associate Gen. Counsel, Jesse I. Etelson, Allison W. Brown, Jr., Washington, D. C., Bernard Gottfried, Director, Region 7, N.L.R.B., Detroit, Mich., for petitioner.

Timothy D. Wood, Schwarrz, Einhart & Simerka, Edward J. Simerka, Cleveland, Ohio, for respondent.

Before LIVELY, MERRITT and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

The National Labor Relations Board has petitioned for enforcement of its order finding respondent, Pinkerton's, Inc., in violation of §§ 8(a)(5) and 8(a)(1) of the Labor Management Relations Act (29 U.S.C. §§ 158(a)(5), 158(a)(1)) and ordering it to bargain with the union certified by the Board as the employees' elected representative, the United Plant Guard Workers of America. The respondent employer claims it did not have to bargain with the union as the union was not properly certified. The employer asks this Court to set aside the election or, in the alternative, to remand for a hearing.

The employer provides uniformed guards and investigative services for its clients. On May 20, 1976, the union filed a representation petition for the full- and part-time plant guards within the jurisdiction of the employer's Detroit, Michigan branch office. On August 18, 1976, a hearing was conducted on a charge that the union was disqualified for an alleged conflict of interest. Au-

gust 23, 1976, the Regional Director found the union was qualified and ordered an election. The election was held January 6, 1977—82 votes were cast for the union, 76 against, 7 additional votes were challenged. January 14, 1977, the employer filed objections, submitted affidavits, and requested a hearing. The Regional Director conducted an administrative investigation, overruled the objections, sustained two of the challenges, held the rest of the challenges were not determinative, and certified the union in a supplemental decision dated March 30, 1977. The employer again requested review by the Board, which was denied May 13, 1977. The employer thereafter refused to bargain, still insisting the union was not properly certified. An unfair labor practice charge was filed against the employer for failure to bargain. The Board refused a hearing as any issue concerning the certification could have been raised in the representation proceeding. The Board then granted summary judgment against the employer and ordered the employer to bargain with the union.

Congress has entrusted to the Board considerable discretion in conducting elections and resolving disputes concerning representation. The task for this Court is to determine whether the Board acted arbitrarily in the exercise of its discretion. *See NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *Harlan # 4 Coal Co. v. NLRB*, 490 F.2d 117, 120 (6th Cir. 1974), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). The Board's findings, if supported by substantial evidence, must be affirmed even though this Court might justifiably reach a different conclusion had it reviewed the case de novo. Conflicting inferences are for the Board to resolve. *See* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Tennessee Packers, Inc., Frosty Morn Division*, 379 F.2d 172, 180 (6th Cir. 1967); *cert. denied*, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967). The party objecting to the validity of an election must bear the heavy burden of demonstrating by specific evidence that the election was un-

fair. *See Harlan # 4 Coal Co., supra,* 490 F.2d at 120. Since the employer admits it refused to bargain with the union, if the union was properly certified, then the Board's order is supported by substantial evidence. *See NLRB v. Wackenhut Corp.,* 471 F.2d 761, 762 (6th Cir. 1972). For reasons stated below, we find the union was not properly certified. We deny enforcement and remand for an evidentiary hearing.

The employer argues the Board committed several substantive and procedural errors when it certified the union. It claims that the union was disqualified due to a conflict of interest and that the election should be set aside because of false representations by the union and because four employees never received their mail ballots. It argues that the Board should have granted it a hearing on the substantive issues and that the Regional Director should not have quashed a subpoena and excluded testimony at the hearing on the conflict of interest question.

## I. Necessity of a Hearing

■ A hearing is not required in an unfair labor practice proceeding if the issues were or could have been raised during a prior representation hearing unless the objecting party presents new evidence. *See* 29 C.F.R. § 102.69(d); *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941); *Tennessee Packers, supra,* 379 F.2d at 179–80.

■ The Board's regulations permit the Regional Director to consider challenges and objections to an election based on an administrative investigation without a hearing if the objections raise no substantial and material factual issues in dispute which more appropriately may be resolved after a hearing. *See* 29 C.F.R. § 102.69(d). The party seeking a hearing must clearly demonstrate that substantial and material facts are in dispute by making specific allegations and a proffer of proof which prima facie would warrant setting aside the election. *See Henderson Trumbull Supply Corp. v. NLRB,* 501 F.2d 1224, 1228 (2d Cir., 1974); *NLRB v. Modine Manufacturing Co.,*

500 F.2d 914, 916 (8th Cir. 1974); *Amalgamated Clothing Workers of America v. NLRB,* 424 F.2d 818, 828 (D.C.Cir.1970); *NLRB v. Louisville Chair Co.,* 385 F.2d 922, 928 (6th Cir. 1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163 (1968); *Tennessee Packers, supra,* 379 F.2d at 178; *NLRB v. O.K. Van Storage, Inc.,* 297 F.2d 74, 75 (5th Cir. 1961).

The employer in the present case did not present any new evidence at the unfair labor practice proceeding. Thus, this Court must determine whether the employer alleged specific facts in dispute which required a hearing at the representation proceeding or whether the employer merely attacked the conclusions of the Regional Director. We will discuss this issue as we discuss in turn each substantive issue raised by the employer.

## II. Alleged Conflict of Interest

The employer alleged that the union was disqualified because of a conflict of interest: one of its employees testified that the union organizer, Mr. Allen, explained he was not trying to organize a subsidiary of the employer's competitor, Guardian Alarm Co., because he had made an agreement not to organize it for six to nine months. The employer attempted to prove at the conflict of interest hearing that in exchange for this, Guardian's supervisors, Mr. Greer and Mr. Tode, former employees of Pinkerton's, gave Mr. Allen names of employees and clients to facilitate the organizing effort.

The president of Guardian and Mr. Allen both denied any agreement between the union and Guardian. They both denied that the union supported Guardian by loans, contributions, or any other method and vice-versa.

The Hearing Officer excluded proffered testimony of a Pinkerton employee, Mr. Maciolek, who would have testified that Mr. Greer arranged a meeting with Greer, Allen, and Maciolek at which Greer offered Maciolek a better-paying job at Guardian and Allen offered to pay Maciolek to encourage employees to support the union. The Hearing Officer felt this testimony related to a showing of interest and claim of

unlawful assistance, which had already been litigated in a prior unfair labor practice proceeding and resulted in a decision favorable to the union.

The Hearing Officer also quashed subpoenas duces tecum to the union and the competitor, Guardian, ruling that although the subpoenas related to a financial tie between the union and Guardian, the employer had not demonstrated that such a proprietary interest existed. The Regional Director affirmed. He held the record did not establish any type of relationship between the union and Guardian or that there was any danger the interests of the employees would be subverted and concluded the union was qualified to represent the employees.

Since the Regional Director made no finding about the truth of Mr. Maciolek's statement, we are bound to accept the employer's version. *See Argus Optics v. NLRB*, 515 F.2d 939, 945 (6th Cir. 1975).

■ The Board or the Hearing Officer has the power to revoke a subpoena. *See Herman Brothers Pet Supply, Inc. v. NLRB*, 360 F.2d 176, 177–78 (6th Cir. 1966); *NLRB v. National Beverages, Inc.*, 418 F.2d 206, 208 (5th Cir. 1969). If the party does not demonstrate that the requested material is relevant, the Regional Director may properly quash the subpoena. *See NLRB v. Adrian Belt Co.*, 578 F.2d 1304 (9th Cir. 1978); *NLRB v. Bancroft Manufacturing Co., Inc.*, 516 F.2d 436, 447 (5th Cir. 1975); *National Beverages, supra.*

■ The requested documents in the subpoenas concerned cash disbursements or receipts, client bids, personnel records, grievance records, logs of prospective clients, stock ownership, payments to the union, loans and investments by and to the employer. The subpoenas are definitely broad-reaching and relate to a possible proprietary interest of the union in the competitor of the employer. However, even assuming all the proffered evidence is true, the employer did not establish any reason for believing a business relationship existed such that those documents would be relevant. The subpoenas were properly quashed. The exclusion of Maciolek's testimony was also proper. For even if his testimony were true, it would not establish a disqualifying conflict of interest.

■ The employer may refuse to bargain with a union if there is a proximate danger that the union would not consider the sole interest of the employees rather than some ulterior motive. *See National Food Stores, Inc.*, 186 NLRB 127, 75 LRRM 1292, 1293 (1970); *Bausch & Lomb Optical Co.*, 108 NLRB 1555, 34 LRRM 1222, 1224 (1954). The Board has disqualified a union which owns a business in direct competition with the employer, *see Bausch & Lomb, supra,* or whose members comprise the majority of the governing body of the employer and where the employer's major source of revenue is the union's welfare fund, *see Medical Foundation of Bellaire*, 193 NLRB 62, 78 LRRM 1169, 1170 (1971); *Centerville Clinics, Inc.*, 181 NLRB 135, 73 LRRM 1337 (1970); *Welfare & Pension Funds*, 178 NLRB 14, 71 LRRM 1610 (1969). *But see Anchorage Community Hospital, Inc.*, 225 NLRB 575, 92 LRRM 1436 (1976) (no conflict where union is minority on employer's governing board and employer receives only small percent of its revenue from union fund). This Court has held that an employer did not have to bargain with a representative from the union who had expressed hostility toward the employer. *See NLRB v. Kentucky Utilities Co.*, 182 F.2d 810 (6th Cir. 1950). *But see NLRB v. Signal Manufacturing Co.*, 351 F.2d 471 (1st Cir. 1965), *cert. denied*, 382 U.S. 985, 86 S.Ct. 562, 15 L.Ed.2d 474 (1966) (insufficient evidence of hostility to support refusal to bargain).

However, the First Circuit has held a local union is not disqualified merely because the affiliated international union has loaned money to a competitor where the possibility of intervention by the international and the effect of the competitor's default on the assets of the union are remote. *See NLRB v. H. P. Hood, Inc.*, 496 F.2d 515 (1st Cir. 1974); *NLRB v. David Buttrick Co.*, 399 F.2d 505 (1st Cir. 1968). Where the union does not compete with the employer and has neither financial stake in the employer's continued well-being nor objectives inconsistent with the employees' in-

terests, the Board has not found a disqualifying conflict of interest. *See American Arbitration Ass'n., Inc.*, 225 NLRB 291, 92 LRRM 1483, 1485 (1976); *National Food Stores, supra.*

In short, if the union has nothing to gain by not asserting the employees' best interests, there is no conflict of interest which would disqualify the union from representing the employees.

In the present case, the employer argued the union had an obligation, be it moral or legal, to keep its bargain not to organize its competitor's subsidiary. But the union could keep its bargain and still assert Pinkerton's employees' best interests at the bargaining table. The alleged agreement is not inconsistent with being a representative of the employees; the union had no financial stake in the continued existence of either Guardian or the employer except insofar as the continued existence of the employer was in the best interests of the employees. The employer has not established that the union had anything to gain by subordinating the interests of the employees to an ulterior motive. The employer has not presented sufficient evidence to prove a proximate danger of a conflict of interest and this issue was properly dismissed by the Regional Director. Having had an opportunity to litigate this matter, the employer was not entitled to a post-election hearing on this issue.[1]

### III. Alleged Misrepresentations

The employer claims the election was invalidated by several misrepresentations made by the union in its campaign literature. The Regional Director did not find any to be materially misleading.

In order to maximize the freedom of choice in selecting a bargaining representative, the Board has assumed the responsibility of ensuring that laboratory conditions prevail during an election campaign. *See Tyler Pipe & Foundry Co. v. NLRB*, 406 F.2d 1272, 1275 (5th Cir. 1969); *Tennessee Packers, supra*, 379 F.2d at 180. But the Board will not set aside an election for any misrepresentation. To warrant setting aside an election, the misrepresentation must be a substantial departure from the truth, made at a time when the other party was prevented from making an effective reply, and which may reasonably be expected to have had an impact on the election. *See Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *Hollywood Ceramics Co.*, 140 NLRB 221, 51 LRRM 1600, 1601–02 (1962).[2]

The employer complained about the union's statements in its December 17th, December 21st, December 23rd, December 27th, December 30th, and January 3rd letters to the employees. The employer claimed it did not receive the December 30th and January 3rd letters until the day before the election, which was held January 6th. No such claim about limited time to respond was made for the earlier letters. The employer admitted the statements in the earlier letters were literally true, but claimed the statements were misleading for failure to give more facts or put the statements in the proper context. The union does not have to give more information which would make the statements unmistakably clear. *See Russell-Newman Manufacturing Co.*, 158 NLRB 1260, 62 LRRM 1195 (1966). As the employer had time to respond to the statements in the earlier letters, the Regional Director properly held they did not warrant setting aside the election.

1. Further support for concluding that no present danger of a potential conflict of interest existed may be found in that by the time of the hearing on the issue, the competitor's subsidiary had lost its license. Whatever had been the past association between Guardian and the union vis-a-vis the subsidiary, it did not exist at the time of the election. *See National Food Stores, supra* (that employers had formerly been allowed to join the union did not create a present danger of a conflict of interest).

2. At the time the Board made its decision in the present case, *Hollywood Ceramics* was the prevailing rule regarding misrepresentations. Later, the Board overruled *Hollywood Ceramics* and decided it would no longer probe into the truth or falsity of parties' campaign statements. *See Shopping Kart Food Market*, 228 NLRB 1311, 94 LRRM 1705 (1977). However, the Board had a change of heart again and overruled *Shopping Kart* and reaffirmed *Hollywood Ceramics*. *See General Knit of California*, 239 NLRB No. 101, 99 LRRM 1687 (1978).

In the January 3rd letter, the employer objected to three statements. The Regional Director found that these statements were not significant departures from the truth and that the employer had earlier presented its position to the employees on the substance of these statements.

With respect to each of these three alleged misstatements, the Regional Director assumed the employer's version of the facts was true. As the employer did not present any new evidence, there was nothing for a hearing to resolve. The only dispute is whether or not, given these facts, the misrepresentations were insubstantial departures from the truth which the employees could evaluate. Such conclusions drawn from the evidence are peculiarly within the expertise of the Board to which this Court will defer if supported by substantial evidence, as in this case. *See Harlan # 4 Coal Co., supra*, 490 F.2d at 126.

█ In the December 30th letter, the employer objects to several statements. The Regional Director found all the statements in this letter to be essentially correct; he found none to be materially misleading for failure to give more information.

The employer objected to the statement by the union that

> Pinkerton's has a $21 million cash surplus!!! *Value Line Investment Survey*, October 15, 1976 said: "Pinkerton's cash and marketable securities are far in excess of operating needs and could be put to more productive use." * (Note: One better use could be to pay a living wage!!!)

The employer contends that the $21 million is not surplus, but is needed for operating capital. The Regional Director noted the employer admitted to having assets of $16 million in cash and $5 million in marketable securities. Without a reference to any further evidence, he held the statement to be essentially correct. This Court cannot agree. *The American Heritage Dictionary* (1969) defines "surplus" as "Being in excess of what is needed or required." *Webster's New International Dictionary* (2d ed. 1941) defines "surplus" as

1. That which remains when use or need is satisfied; excess; overflow.
       *    *    *    *    *    *    *
4. *Accounting.* a An excess of net income over fixed charges and dividends during a given period. b The aggregate excess of assets over liabilities accumulated by a business enterprise during its history, except so far as they have been made the basis for new issues of stock.

"Cash surplus" implies that Pinkerton's cash and marketable securities are not needed for present expenses and are available for distribution. The union's parenthetical phrase gives further weight to this interpretation. The employer admits that it has $21 million in cash and marketable securities, but did not admit that it had $21 million available for distribution. Without any more evidence, this Court cannot determine if this statement is true or materially misleading. The amount of money available for distribution as wages may be material, especially in a campaign such as the one in this case where the union proclaimed boldly and often that the employer could pay more money but would not unless the employees organized. This objection must be remanded for hearing on whether the cash and marketable securities were in excess of operating expenses and whether the statement, if false, was likely to have had an impact upon the employees. The employer also objected to the union's statement in the December 30th letter that "Pinkerton's Michigan Operation made *more* money with *fewer* employees last year!!" (emphasis original). The Regional Director reported that the employer presented evidence that Pinkerton's Michigan operation made less money with fewer employees in 1975, but he found the union's figures reflected the actual state of affairs. The employer attacks these figures as being misleading. The union presented Pinkerton's Michigan figures as follows:

|  | 1974 | 1975 |
|---|---|---|
| Number of Employees | 1,325 | 1,287 |
| Income from services | $7,523,188.00 | $7,368,224.00 |
| Wages paid | $5,809,459.00 | $5,674,968.00 |
|  | $1,713,729.00 | $1,693,256.00 |
| Average contribution per employee | $ 1,293.00 | $ 1,316.00 |

The employer claims these figures suggest that Pinkerton's made about $1,000 per employee profit each year whereas Pinkerton's really made less than $200 per employee profit. The Regional Director found these figures not inaccurate per se as there was no reference to profits. He found the employees could reasonably be expected to know that other expenses besides wages must be subtracted from revenues to calculate profits. Besides, the Regional Director continued, the employer, in a letter dated December 31, listed all the expenses which must be subtracted. Though not in response to the December 30th letter, the employer's December 31st letter, according to the Regional Director, sufficiently educated the employees so that the union's December 30th letter was not materially misleading.

This Court cannot agree. The employer's letter explained what must be subtracted, but not how much. The record does not contain any evidence to support the Regional Director's finding that the employees would know how much less the profits were than the ambiguous "average contribution per employee" figure given by the union. Unlike the other union statements which were literally true, this statement is either false or meaningless: if "average contribution per employee" means "profits," the term is false; if it does not mean "profits," the term is meaningless because it has no relation to the amount of money that is available for distribution. The employer's reading is reasonable given the rest of the letter—just below these figures the union stated that Pinkerton's *made* more money per employee in 1975 than in 1974 and that the Michigan Operation sent $3,406,985 *made* in Michigan to the Corporation Big Shots in New York City. (emphasis added.)

Just below that the union asks the question, Where are the *Profits* going? (emphasis added.) Answer, to the shareholders. *See Henderson Trumbull Supply Corp., supra,* 501 F.2d at 1229 (absent a hearing, Court cannot say statement that company "made" $1.3 million, rather than "grossed," was not materially misleading). Compare *Louisville Chair Co., supra,* 385 F.2d at 927 (statement that company's "gross profits" were $1.7 million was literally true and not materially misleading).

Profits may be important to the employees, especially as in the present case where the union presented a strong argument that the employer could afford to pay more. *See Argus Optics, supra,* 515 F.2d at 945. The Regional Director did not rule whether or not company profitability was an important issue, nor did he hold an evidentiary hearing to determine whether or not these figures were misleading. Thus, we are bound to accept as true the employer's version, *Argus Optics, supra,* 515 F.2d at 945, and accepting that, we cannot grant enforcement. The record does not support a finding these figures were not materially misleading. Since we remand for an evidentiary hearing on other grounds, we remand to the Board for an evidentiary hearing on what knowledge the employees had with respect to true *profitability of the employer* and whether these figures were materially misleading.[3]

## IV. Challenges to Ballots

There were six challenged ballots on the grounds of tardiness or eligibility. The Regional Director sustained two, overruled three, and came to no decision on the remaining employee's eligibility. One mail ballot was voided for lack of signature; a replacement ballot was sent but was not

---

3. *Harlan #4 Coal Co., supra,* is distinguishable. There, the employer objected to the Union's letter concerning the wage-price freeze. This Court upheld the Board's conclusion that the letter was not materially misleading, first, because the letter was ambiguous and subject to several interpretations; second, because the union claimed no special knowledge with respect to the wage-price freeze; and third, there was evidence to support a finding that the employees had sufficient knowledge to evalu-

ate the union letter from widespread publicity about the wage-price freeze and the employer's statements. The Court concluded that even if it used the employer's interpretation, it would find substantial evidence to support the Board's finding that the letter was not materially misleading. In the present case, there is no evidentiary support for concluding the employees had the knowledge to evaluate the statement.

returned in time and the Regional Director refused to count it. Another ballot was inadvertently torn by Board agents while opening it. The unmarked "yes" remained, the "no" was missing. The Regional Director was troubled by this and would have set aside the election had the ballot been determinative. As the torn ballot, the ballots with overruled challenges, and the undetermined ballot were not determinative, the Regional Director did not count any of them.

Decisions with respect to the eligibility of employees, see *Matlock Truck Body & Trailer Corp. v. NLRB*, 495 F.2d 671 (6th Cir.), *cert. denied*, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974), or counting late ballots, see *Wackenhut Corp., supra*, 471 F.2d at 762; *Westchester Plastics of Ohio, Inc. v. NLRB*, 401 F.2d 903, 908 (6th Cir. 1968); *Queen City Paving Co.*, 243 NLRB No. 12, 101 LRRM 1472 (1979), are within the Board's discretion.

Were only these ballots before the Court, we would find no abuse of discretion in the Regional Director's disposition of them. However, the employer alleges the Regional Director abused its discretion in not overturning the election because four employees failed to receive their mail ballots. The Regional Director acknowledged that four employees claimed, by affidavits, to have never received their mail ballots. The Regional Director said that the records showed the ballots were sent to the addresses furnished by the employer.

The Board has set aside an election where a ballot was inadvertently not sent to an employee and the vote was tied. *See Star Baking Co.*, 119 NLRB 835, 41 LRRM 1178 (1957). The Board held it had the responsibility to establish proper procedures so all the eligible voters could vote. In the present case, the Board argued it could rely upon its procedures. While we agree the Board does not have to poll each employee to make sure he received a ballot, see *Wackenhut, supra*, 471 F.2d at 762, and the Board may uphold an election where it used its standard procedures and ballots were lost

through no fault of its own, *see J. Ray McDermott & Co., Inc. v. NLRB*, 571 F.2d 850, 855 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978), we cannot determine from the record that the Board's procedures were such as to ensure all eligible voters could vote or that these four employees were sent ballots. The Regional Director refers to records, but no affidavit or certificate of mailing is in the record before us. Whatever the records are to which the Regional Director referred, they have not been made available to us or to the employer. The Regional Director's decision is not supported by substantial evidence. *See Prestolite Wire Division v. NLRB*, 592 F.2d 302 (6th Cir. 1979). We are particularly skeptical of the regularity of the Board's procedures as all the employees who did not receive ballots live in the same region. The employer alleged and proffered sufficient information to raise a factual issue that ballots were not sent to four employees. Since these four plus the five votes against whom challenges were not sustained could have changed the outcome of the election, these four cannot be ignored. We must remand for an evidentiary hearing; if the ballots were in fact sent to these four employees, then the Board may in its discretion refuse to set aside the election on the basis of these four ballots. (The Board may, however, still set aside the election if it finds a material misrepresentation in the union's December 30th letter.) If the ballots were not sent, then the election must be set aside.

For the reasons stated above, this Court denies enforcement of the Board's order and remands for further proceedings consistent with this opinion.