AIRCRAFT RADIO CORPORATION (DIVISION OF the CESSNA AIRCRAFT CO.), Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 74–2159.

United States Court of Appeals, Third Circuit.

Argued June 26, 1975.

Decided July 24, 1975.

A. C. Matthews, Jr., Havens, Wandless, Stitt & Tighe, New York City, for petitioner.

Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Dep. Associate Gen. Counsel, N.L.R.B., Michael S. Winer, Roger T. Brice, Washington, D. C., for N.L.R.B.

Before VAN DUSEN, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

An employer's challenge to a representation election conducted under the supervision of the National Labor Relations Board is the subject of this petition for review and cross-petition for enforcement. We conclude that charges of deliberate misstatements about the employer's earnings published by the union in the closing days of the campaign require affirmative action by the Board. Accordingly, the petition for review will be granted in that the Board's order that the company bargain with the union will be set aside and the Board's cross-petition for enforcement will be denied.

In September, 1973, the Aircraft Radio Company (ARC) and the International Union of Electrical Radio and Machine Workers (IUE) filed the customary N.L.R.B. consent election form, providing that objections to election procedures would be resolved by the Board's regional director.[1] The election was held on September 28, 1973 and resulted in a victory for the union by the narrow margin of 217 votes in its favor and 199 opposed. Sixteen challenged ballots were not counted.

Thereafter, the company raised a number of objections to the election including charges of misrepresentation by the union as to:

1. wages paid by ARC as compared with those paid in unionized plants;

2. pensions furnished by ARC in comparison with those at union plants;

3. the terms of a collective bargaining agreement at the nearby plant of the Industrial Timer Corporation;

4. the union initiation fee waiver.

After an investigation by the regional director, all of the objections were dismissed. In due course the Board issued a summary judgment against the company affirming the regional director's action.[2] Although the employer has

---

1. 29 C.F.R. §§ 102.62, 102.69(c) (1973).

2. The union was certified as the employees' bargaining representative on December 14, 1973, but the company refused to bargain with it. The union then filed charges with the Board alleging unfair labor practices under 29 U.S.C. § 158(a)(5) and (1). The company asserted as defenses the same objections to the election which had previously been dismissed by the regional director. Thus, while election procedures are not ordinarily subject to direct appellate review, by following this circuitous

presented a number of objections, we rely primarily on one of them in vacating the Board's action.

Aircraft Radio Company, located at Boonton, New Jersey, is the second smallest of seven operating divisions of the Cessna Aircraft Company which has its headquarters at Wichita, Kansas. ARC is engaged in the manufacture, distribution and sale of aviation communication and navigational equipment. It supplies its products to Cessna as well as to other competitive firms. ARC is conducted as an independent business; sales and profits are accounted for separately, and its wage agreements are independently negotiated. In fiscal year 1972, ARC had total sales of $11,000,000 and in 1971, $6,700,000, which resulted in net losses for each of those years. By contrast, Cessna is much larger and more profitable. Its sales for 1972 were $248,-000,000 which resulted in profits of $13,-500,000.

The union's campaign literature attributed Cessna's sales and profits to ARC. In a letter to the employees dated September 19, 1973, the union stated that ARC sales for 1972 were $248,421,000 and profits were $13,500,000. The letter continued:

"The above report proves that while the company made the greatest profit in the history of the company, they did not share it with the workers. The truth of the matter is that percentage-wise Aircraft Radio earnings were greater than any other company, including all the giants of the industry."

On September 24, 1973, the union distributed another letter, reading in part:

"It is also common sense for an employer, like ARC, who has made the greatest profits in history to share some of those profits with us, the people who have made all that profit possible.

"We were amazed to learn that company profits increased 90% just last year and that the return to ARC stockholders rose 100%."

The company responded with a letter on September 25, 1973, asserting that the sales and profits cited by IUE were those of the Cessna Aircraft Company, Wichita, Kansas, and that ARC was independently responsible for all phases of its own business, including making a profit. On the following day, the company general manager delivered a prepared speech to the employees, explaining the distinction between ARC and Cessna and making available the financial reports of both concerns. On the same day, however, the union in yet another leaflet reiterated the claim that the company had made profits of $13,-500,000 and stated that " . . . ARC's financial condition represents the strongest possible financial picture of any company." Also on that day, the union distributed a leaflet in Spanish showing profits of $13,510,000 made by "la compañia Cessna Aircraft Radio" (Cessna Aircraft Radio Company) which it alleged was "breaking all records of earnings." This leaflet was the only printed appeal in the Spanish language made by the union and was obviously directed at some 39 employees of ARC who spoke that language, a significant number in light of the close vote.

On September 27, the eve of the election, the union issued its final leaflet which said, inter alia:

"FLASH!!!!

*Company Admits Recordbreaking Profits, BUT!*

"The company's last straw in their attempt to hold on to their gold mine plant, Aircraft Radio, Boonton, N.J., again tries their hand at distorting the facts.

"In their letter of propaganda dated 9–26–73 they refer to the union's statement of company's profit. They do not deny their recordbreaking prof-

route the same issues are presented to us. *See National Labor Relations Board v. James H. Matthews & Co.,* 342 F.2d 129 (3d Cir.), *cert. denied,* 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965).

its, but they go on to say that the greatest amount of that profit was made at their other plants."

The regional director, after making an investigation, concluded that:

"As to the alleged material misrepresentations in Petitioner's [union] campaign literature, the Employer had, and experienced, the opportunity to make effective replies. In such circumstances the Board will not set aside an election." (footnote omitted).

The scope of N.L.R.B. supervision of representation elections has been the subject of lively discussion. It has been suggested that the Board should be more interested in assuring the finality of elections rather than the niceties of campaign activities; that the Board lacks the expertise to determine what actually influences the voters' decision; and that fairness rather than coercion should be the test for campaign tactics. *See* Getman and Goldberg, *The Myth of Labor Board Expertise,* 39 U.Chi.L.Rev. 681 (1972); Samoff, *N.L.R.B. Elections: Uncertainty and Certainty,* 117 U.Pa.L.Rev. 228 (1968); Bok, *Regulating N.L.R.B. Election Tactics,* 78 Harv.L.Rev. 38 (1964).

■ While forceful arguments may be made favoring a different policy, it is clear that the Board is committed to an active supervisory role over the pre-election conduct of the contestants. In *National Labor Relations Board v. Savair Manufacturing Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1974), the Supreme Court repeated its language in *National Labor Relations Board v. Tower Company,* 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946), that the duty of the Board is to establish:

"   .   .   .   'the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.'" 414 U.S. at 276, 94 S.Ct. at 498.

\*   \*   \*   \*   \*   \*

"The Board in its supervision of the union elections may not sanction procedures that cast their weight for the choice of a union and against a non-union shop, or for a nonunion shop and against a union." *Id.* at 280, 94 S.Ct. at 500.

In ruling upon campaign propaganda, the Board tolerates a degree of hyperbole, intemperance and inaccuracy. We have reservations about a policy of a governmental agency which in the course of its supervisory role condones less than substantial honesty by the campaigners. But, in any event, the Board has stated that it will set aside a representation election where: A material fact has been misrepresented; opportunity for reply has been lacking; and the misrepresentation has had an impact on the free choice of the employee. *See Linn v. Plant Guard Workers,* 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1965); *Hollywood Ceramics Co.,* 140 N.L.R.B. No. 221 (1962).

■ The importance which the Board attributes to the opportunity of rebuttal is understandable, although not completely satisfactory. By emphasizing this factor, the Board skirts the delicate issue of freedom of speech during a campaign and avoids the necessity of detailed and exhaustive regulations on permissible statements. *See* Bok, *supra.* However, the propaganda technique of the "Big Lie" repeated over and over again is well known, and its effectiveness has been demonstrated. During the course of a campaign, the rebuttal procedure may be a useful regulatory tool but its invocation, post election, as a defense should be received with caution. Fairness is not readily apparent when a party which has been successful in the balloting through the use of deliberate falsehood is allowed to retain its victory by pleading that its opponent had opportunity for rebuttal.

Courts of appeals in several circuits have held that misinformation about company profits can be material, since the extent to which employees share fairly in the results of their labors is of great interest to them. *Argus Optics v.*

*National Labor Relations Board,* 515 F.2d 939 (6th Cir. 1975); *Henderson Trumbull Supply Corporation v. National Labor Relations Board,* 501 F.2d 1224 (2d Cir. 1974); *National Labor Relations Board v. G. K. Turner Associates,* 457 F.2d 484 (9th Cir. 1972). In *Tyler Pipe & Foundry Company v. National Labor Relations Board,* 406 F.2d 1272 (5th Cir. 1969), the union allegedly misstated the company earnings. Although the Board determined that employees would not have been affected, the court on review said:

> "We cannot accept the Board's complacency . . .
>
> \* \* \* \* \* \*
>
> "[I]n a case where election propaganda is challenged by a party to the election, the ultimate question before the Board is *whether the propaganda has lowered the standards to the point where it may be said that the uninhibited desires of the employees cannot be determined from the election.* Those influences, regardless of their truth or falsity, which make impossible an impartial test, are grounds for invalidation of an election." 406 F.2d at 1275 (emphasis in original).

In the case *sub judice,* there is no doubt that the representations about ARC's earnings and profits were clearly false. It cannot be said that on this record the union was merely mistaken in its pronouncements because after the employer produced the accurate information on September 25 and 26, the union republished the same misrepresentations. Dissemination of the erroneous information, therefore, was not merely inadvertent or mistaken, it was deliberate and calculated. Moreover, the election eve efforts were designed to damage the employer's credibility, always a key issue in representation campaigns.

■ The Board's determination that the harm was cured because the employ-

er had the opportunity to, and did, in fact, counter the union's assertions does not adequately evaluate the circumstances. The union's misstatements in Spanish and its "Flash! ! ! !" on September 27 came too late to allow effective replies. Even though the employer had addressed the subject previously, it was entitled to a second opportunity. *Schneider Mills, Inc. v. National Labor Relations Board,* 390 F.2d 375 (4th Cir. 1968); *cf. Aerovox Corp. v. National Labor Relations Board,* 409 F.2d 1004 (4th Cir. 1969). The careful timing of the union's final efforts which repeated the distortions of its earlier communications denied the employer an opportunity for appropriate response. Under the circumstances here, where the falsehoods were repeated in the last distribution by the union, ARC was entitled to the "last word."

Since this appeal is based upon a consent election, we must determine whether the action of the regional director or the Board was arbitrary or capricious. *Carlisle Paper Box Co. v. National Labor Relations Board,* 398 F.2d 1 (3d Cir. 1968); *National Labor Relations Board v. James H. Matthews & Co.,* 342 F.2d 129 (3d Cir.), *cert. denied,* 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965). We conclude that this standard has been met because, as we have already shown, the misrepresentation here was material and flagrant. The balloting was so close that the result might well have been different had only a few people been influenced; the employer was not at least given the opportunity for the "last word;" and, therefore, the election did not have the safeguards necessary to "insure the fair and free choice of bargaining representatives."

The order of the Board will be set aside and the cross-petition of the Board for enforcement will be denied. The matter will be remanded to the Board for further proceedings consistent with this opinion.