**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SANTEE RIVER WOOL COMBING COMPANY, INC., Respondent**
**(two cases).**

**No. 75-1894.**

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1976.

Decided June 10, 1976.

Jane P. Schlaifer, Atty., N. L. R. B., Washington, D. C. (John D. Burgoyne, Atty., N. L. R. B., John C. Miller, Acting Gen. Counsel, John S. Irving, Jr., Deputy Gen. Counsel, and Elliott Moore, · Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief), for petitioner.

J. Thomas Kilpatrick, Atlanta, Ga. (George K. McPherson, Jr., Smith, Currie & Hancock, Atlanta, Ga., on brief), for respondent.

Before WINTER, RUSSELL and FIELD, Circuit Judges.

WINTER, Circuit Judge:

■ The Board's application for enforcement of its bargaining order in No. 75–1894 and its application for summary enforcement of its order that refusal to bargain was an unfair labor practice (No. 76–1184) * present the question of whether a representation election should be set aside because of an intentional falsehood by the winning union, made on the eve of the election, which accused the employer of discharging an employee for union activities. The Board upheld the validity of the election and certified the union on the ground that the misrepresentation could not have had a significant impact on the voters because the company had already developed a substantial anti-union reputation through its own independent unfair labor practices. We disagree and decline enforcement. We hold that misconduct of one party cannot be held harmless merely because of antecedent misconduct by another party.

I.

In June, 1972, the Textile Workers Union of America, AFL–CIO (the union), began a campaign to organize all production and maintenance employees except clerical

---

* The Board's motion for summary enforcement in No. 76–1184 was conditioned upon "the event that the Board's order . . . now pending before this Court as Case No. 75–1894 is enforced."

workers, professionals, guards and supervisors, at the Jamestown, South Carolina, plant of Santee River Wool Combing Company (the company). The campaign culminated in an election supervised by the Board on October 12 and 13, 1972. One hundred fifty-two voters cast ballots for the union, and 99 against it. The company filed several objections to the election. A hearing was held on the objections before an administrative law judge, who recommended that all objections be overruled. With one member dissenting, a three-member panel of the Board affirmed the administrative law judge and certified the union. 210 N.L.R.B. 530 (1974). The company refused to bargain with the union in order to obtain review of the Board's decision, and the Board found that the company thereby committed unfair labor practices and issued various enforcement orders. 221 N.L.R.B. 21 (1975); 221 N.L.R.B. 20 (1975); 218 N.L.R.B. 138 (1975). Three unfair labor practice cases have been consolidated for decision here since all hinge on the validity of the Board's certification of the union and, ultimately, on the validity of the election.

The organizational campaign was not a tranquil one. In a previous unfair labor practice proceeding brought by the union, the Board found that the company "through its supervisory hierarchy and with advice of counsel engaged in a broad and systematized program to discourage its employees from adherence to the Union." The Board ruled that the company committed unfair labor practices by interrogating employees concerning their union activities; by threatening plant closure, discharge and other job reprisals; by telling employees that the company had a list of union adherents, creating an impression of surveillance; and by discharging two employees for union activities. *Santee River Wool Combing Co.*, 210 N.L.R.B. 530 (1974), *enforced*, 510 F.2d 966 (4 Cir. 1975).

While the company initially presented several objections to the election, it presses only one here. On the evening of October 11, 1972, the day before the election, a meeting was held by the union which was attended by about sixty employees. Among those speaking at the meeting were Pope, a union representative, and Pringle, an employee favorable to the union. The administrative law judge found, and the Board agreed, that statements made at the meeting created the impression that Pringle had been discharged from employment for union activity, and that the union would attempt to have him returned to work with back pay. What was not known to the listeners at the meeting was that Pringle had in fact not been discharged for union activity or otherwise, but had been given a medical leave of absence. The union had filed an unfair labor practice charge on behalf of Pringle in late July or early August, 1972, but had withdrawn it upon learning the true circumstances surrounding Pringle's departure from work. Nevertheless, the union filed a second unfair labor practice charge on October 11, 1972, and created the impression at the meeting that evening that Pringle had been fired, suggesting to the employees present that they needed the union to protect them from such arbitrary company action. The timing of the union's charge clearly precluded a response by the company. On this basis, the company asks that the election be set aside.

## II.

It is axiomatic that not every misstatement made during the course of an organizational campaign will justify the invalidation of a representation election. In this circuit, an election will be set aside only where

(1) there has been a material misrepresentation of facts, (2) this misrepresentation comes from a party who has special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election. * * * Where these elements are present, the Board has found that the legitimate limits of campaign propaganda have been exceeded and has set aside the election on the ground that it does not reflect the free desires of the employees without further requiring that prejudice

to the fairness of the election be shown. *Celanese Corp. of America v. NLRB*, 291 F.2d 224, 226 (7 Cir.), *cert. denied*, 368 U.S. 925 [, 82 S.Ct. 360, 7 L.Ed.2d 189] (1961), *quoted with approval in Collins & Aikman Corp. v. NLRB*, 383 F.2d 722, 727 (4 Cir. 1967); *see NLRB v. Bata Shoe Co.*, 377 F.2d 821 (4 Cir.), cert. denied, 389 U.S. 917 [, 88 S.Ct. 238, 19 L.Ed.2d 265] (1967).

Each of these three elements is present here.

■ The misrepresentation was material. It "concerned the important matter of job security, [and] must have had a significant impact on the employees causing them to adhere to Petitioner for protection." *Weslock, Div. of Tool Research & Eng. Corp.*, 199 N.L.R.B. 549, 550 (1972). Further, the untruth was deliberate. "An innocent mistake might occur for a number of reasons. One must regard deliberateness as an admission that the matter was important." *N. L. R. B. v. Trancoa Chemical Corp.*, 303 F.2d 456, 461 (1 Cir. 1962). *See also Cross Baking Co. v. N. L. R. B.*, 453 F.2d 1346, 1348 (1 Cir. 1971).

■ It is not disputed that the union knew, since the time that it had withdrawn its first unfair labor practice charge, that Pringle was not in fact discharged for union activities. Thus, the union was in an authoritative position to know the truth. Furthermore, the presence of Pringle at the meeting would have tended to bolster the credibility of the union's statements about the circumstances surrounding his absence from work. It is the *apparent* correctness of a statement which must be considered in determining its effect upon the voters, and it is clear that in this case those in attendance at the meeting would have regarded the union's representations about Pringle as authoritative.

Finally, the administrative law judge found, and the Board agreed, that the company did not have sufficient opportunity to correct the misrepresentation before the election which began the next morning.

■ The Board virtually concedes that application of the well-established tripartite test we have just discussed would require the setting aside of the election in a normal case. The Board found, however, that because the company had "already doubly earned" a reputation for discharging employees for union activities by the dismissals of employees Brown and Nesmith, and "perhaps" by other violations of the Act, it was unbelievable that the union's misrepresentation about Pringle could have had a significant impact on the election. On this ground, the Board distinguished its own decision in *Weslock, Div. of Tool Research & Eng. Corp.*, supra, a case identical to this one but for the element of prior company misconduct.

### III.

■ The Board's decision is not sustainable either factually or legally. We do not find evidence to support the Board's conclusion that the union's deliberate untruth added nothing significantly new to the employees' knowledge about the company. The Board's conclusion that the union's substantial misrepresentation was harmless rested upon its finding that the company had discharged two employees, Nesmith and Brown, for union activities. It made passing reference to other violations of the Act by saying that "perhaps" they rendered the company incapable of sustaining further harm to its credibility. But the record shows that employee Nesmith was not discharged until after the election, so that his fellow employees could not possibly have known of his discharge on election day. While the company threatened Nesmith with discharge prior to the election, threats of dismissal and actual dismissal are likely to be qualitatively different in their impact on other employees.

■ Employee Brown was discharged about three weeks before the election. The asserted ground for his dismissal was violation of a company no-smoking rule. The Board subsequently determined that Brown was actually discharged for union activities. This decision was reached on May 10, 1974,

and affirmed an administrative law judge's decision of August 21, 1973. Nothing in the record reflects that any of the other employees knew of Brown's dismissal prior to the election, or that they were given reason to believe his dismissal was for union activity. In its brief, the Board appears to suggest that it was entitled to infer that the other employees knew of Brown's dismissal and the true reason therefor. Even were we to agree with the Board that such an inference is permissible, however, we would be unable to conclude that widespread knowledge of one anti-union discharge renders harmless an intentionally false allegation of another.

The Board's general reference to the company's other violations of the Act was only in the context that "perhaps" they immunized the company against the impact of the union's deliberate untruth. Since the Board did not rest on other violations, we see no reason to assay them or their immunizing effect.

The Board misconceives the nature of the three-pronged test—materiality, authoritativeness, irrebuttability—which we have previously discussed. The Board would add as an additional requirement that the misrepresentation have had a substantial impact on the election. But the existence of the three elements in the test has been thought to be a useful indicator of the presence of a substantial impact. When all three elements are satisfied, substantial impact is presumed. This is clear from the language we quoted from *Celanese Corp. of America v. NLRB, supra*:

> Where these elements are present, the board has found that the legitimate limits of campaign propaganda have been exceeded and has set aside the election on the ground that it does not reflect the free desires of the employees *without further requiring that prejudice to the fairness of the election be shown.* 291 F.2d at 226 (emphasis added).

Moreover, acceptance of the Board's approach would give each contestant in an organizational campaign license to spread material falsehoods so long as the opposing party's conduct had already been (or could be hoped to become) sufficiently egregious that the misrepresentations. could not be thought to have any additional impact on the voters. We do not perceive this to be the law. An escalating pattern of falsehoods "earning" more falsehoods until all hope of a fair election has been dashed could too readily emerge; yet the Board's decision would apparently uphold the result on the ground that opposing lies cancel each other out. We reject this as a permissible means of accomplishing the statutory objective of purity of elections.

We do not condone the company's past unfair labor practices, but they cannot alter the fact that the union too committed an act of misconduct which, considered independently, as we think it must be, requires the election to be set aside.

No. 75–1894—*ORDER VACATED AND ENFORCEMENT DENIED*

No. 76–1184—*SUMMARY ENFORCEMENT DENIED*