BLACKMAN–UHLER CHEMICAL DIVI-
SION, SYNALLOY CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 76–1530.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1976.

Decided Feb. 28, 1977.

Rehearing En Banc Granted April
15, 1977.

Opinion on Rehearing Sept. 12, 1977.
See 561 F.2d 1118.

Arthur McM. Erwin, Spartanburg, S. C.
(Erwin, Bradley & Edwards, Spartanburg,
S. C., on brief), for petitioner.

David A. Fleischer, Atty., N. L. R. B.
(John S. Irving, Jr., Gen. Counsel, John E.
Higgins, Jr., Deputy Gen. Counsel, Carl L.
Taylor, Associate Gen. Counsel, Elliott
Moore, Deputy Associate Gen. Counsel, and
Michael S. Winer, Atty., N. L. R. B., Wash-
ington, D. C., on brief), for respondent.

Before WINTER, BUTZNER and HALL,
Circuit Judges.

K. K. HALL, Circuit Judge:

Blackman-Uhler Chemical Division, Syn-
alloy Corporation (the company) seeks re-
view and the setting aside of a Decision and
Order of the National Labor Relations
Board issued against it following proceed-
ings under the National Labor Relations
Act, as amended. 29 U.S.C. §§ 151, *et seq.*
The Board has filed a cross-application for
enforcement of its Order.

The basic facts are not in dispute. A
Board-ordered representation election was
scheduled for certain employees of the com-
pany for September 12, 1974. On the morn-

'ing of election day, members of the International Molders & Allied Workers Union, AFL-CIO (the union) distributed a "leaflet"[1] at the plant gate. The company was unaware of the leaflet distribution until late in the morning on the day of the election, which was too late to permit a reply.

The handout contained, *inter alia,* a "Statement of Consolidated Earnings," with the source being cited as "Synalloy Corporation Six-Month Report to Stockholders." The statement of earnings was indeed a facsimile of the consolidated earnings from the Synalloy Corporation six-month report. The report reflected that sales were up 18% and earnings up 250%. Also included in the leaflet in bold type were these statements:

"YOU MAKE THE DYE BUT THE 'BIG SHOTS' MAKE THE CASH;" "WHERE'S YOUR SHARE OF THE BLACKMAN–UHLER PROFIT BONANZA?;" "BLACKMAN–UHLER has been looking after their interest for years! Now's the time for you to start looking after YOURS!"

Included in smaller typed letters was:

"What was your wage increase in the same year that Blackman-Uhler hit the profit jackpot? Compare the raise you received (IF YOU EVEN GOT ONE!) to the over 250% increase in Company profit. . . . [i]t's time for Black-Uhler [sic] employees to insure a fair share of the profits. . . . [t]he only way to achieve this is through a strong Union Contract."

The company contends that the leaflet distribution was materially misleading to the voting employees because Blackman-Uhler is a mere division of Synalloy Corporation. While the handout could give the impression that Blackman-Uhler was selfishly making big profits, the company's profits were actually "off" 48%. It was the parent corporation, Synalloy, that had over a 250% profit increase.

The union prevailed in the election and was certified but the company refused to bargain, maintaining that the union was improperly certified due to the influential effect of the union's misleading propaganda. The company argued that the leaflet represented the profits as being those of Blackman-Uhler, not those of Synalloy, and therefore the election should be set aside.

■ The Board affirmed the overruling of Blackman-Uhler's objections and ordered the company to bargain with the union.[2] We agree with the Board that the leaflet does not contain information that warrants invalidating the representation election.

The source of the company's statement of earnings was clearly identified as the parent firm's six-month report to stockholders. Moreover, the earnings report reproduced on one side of the leaflet was headed by and entitled, "Statement of Consolidated Earnings." This connotes that the reported earnings were those of the parent corporation. Blackman-Uhler is merely a division of Synalloy and is directly accountable to it. Because of this relationship, the company would never issue a statement of consolidated earnings. In the context of the union campaign, the information in the leaflet could be evaluated by the employees through the exercise of their common sense and good judgment.

"The Board is not a censor over the campaign propaganda circulated by either union or management during a representation election. Correction of deceptive or untruthful statements is left primarily to the participants themselves and the good sense of the voters. The Board intercedes to set aside elections only when improper campaign tactics touch material matters and create a climate which thwarts the employees' free choice and distorts the electoral process (cita-

---

1. The term "leaflet" was used originally by the Regional Director in describing the handout. It was composed of one sheet of paper measuring 11 inches by 17 inches, with both small and bold type on each side.

2. The Board's Order refusing to reverse the Regional Director's Report on Objections is reported at 217 N.L.R.B. 7 (1975).

tions omitted)." *Schmerler Ford, Inc. v. N.L.R.B.*, 424 F.2d 1335, 1338 (7th Cir. 1970), *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970).

In *N.L.R.B. v. Santee River Wool Combing Co., Inc.*, 537 F.2d 1208, 1210, 1211 (4th Cir. 1976), this court reaffirmed its policy of finding that an election should be set aside, where, during a union election campaign:

"(1) there has been a material misrepresentation of facts, (2) this misrepresentation comes from a party who has special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election. * * * Where these elements are present, the Board has found that the legitimate limits of campaign propaganda have been exceeded and has set aside the election on the ground that it does not reflect the free desires of the employees without further requiring that prejudice to the fairness of the election be shown (citations omitted)."

Although the company did not have sufficient time to effectively reply, the other two essential elements for setting aside an election are not present. While the leaflet may have been ambiguous or misleading, it was not of sufficient degree to constitute a material misrepresentation. Concerning the profits of Blackman-Uhler referred to on the leaflet, it is noted that the union used no specific figures nor any specific information to show or to imply a knowledge on its part of Blackman-Uhler profits.

Similar campaign propaganda is discussed in *N.L.R.B. v. Louisville Chair Co.*, 385 F.2d 922 (6th Cir. 1967), *cert. denied*, 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163 (1968). Both two weeks before an election and just a "few" days before the election, the union passed out a handbill stating in part: "The Company's gross profit for the last fiscal year was—$1,730,111.00—VOTE YES. Let's get our share of the pie!" The statement concerning the company's gross profit was literally true, but the Respondent maintained it was misleading since it implied that the full amount was distributable

net income, whereas the company's actual net income was only $244,198.00. The court in *N.L.R.B. v. Louisville Chair Co.*, *supra*, at 927, held that, while the union's "use of the gross profits figure was ambiguous and susceptible to different interpretations, ambiguity in campaign propaganda is not sufficient by itself to vitiate an election."

In *N.L.R.B. v. Georgia-Pacific Corp.*, 473 F.2d 206 (8th Cir. 1973), slightly misleading handbills were distributed by the union within 24 hours of an election. However, the court held that, where there was not a substantial departure from the truth, the fact that such propaganda was distributed at a time when the employer could not effectively reply does not necessitate setting aside the election. *Accord, Coronet-Western v. N.L.R.B.*, 518 F.2d 31 (9th Cir. 1975).

This court discussed misleading election propaganda distributed by the union at the eve of a representation election in *N.L.R.B. v. Bata Shoe Co.*, 377 F.2d 821 (4th Cir. 1967), *cert. denied*, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967). Judge Craven asserts that, "The true rule is not 'that when false statements are made they constitute an interference with free choice, but that *when* false statements are made which constitute an interference with free choice, for or against a bargaining representative, an election should be set aside.' *Anchor Mfg. Co. v. NLRB*, 300 F.2d 301, 303 (5th Cir. 1962)." *N.L.R.B. v. Bata Shoe Co.*, *supra*, at 829.

■ Misleading campaign propaganda is not condoned by this court, nor will it be tolerated when the misrepresentation crosses the threshold of sufficient materiality. However, here, we cannot say the leaflet in question had such a misleading effect.

■ Generally, the burden is on the party seeking to overturn the Board-conducted representation election to establish that the election was not fairly conducted. *N.L.R.B. v. Mattison Machine Works*, 365 U.S. 123, 124, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961). The question of whether conduct interfered with an employee's free choice in

a representation election is one primarily left to National Labor Relations Board discretion. In such Board-conducted representation elections, some degree of puffing and propagandizing must be permitted. *N.L.R.B. v. Sumter Plywood Corp.,* 535 F.2d 917, 920 (5th Cir. 1976).

We agree with the Board that this was a case in which the evaluation of campaign material is to be left to the good sense of the voters. The Board's Order will be enforced.

*ENFORCEMENT GRANTED.*

WINTER, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion, in my view, strains the facts and ignores the controlling principles of law.

### I.

The case turns upon the text of the union "handout," a one-sheet broadside clearly calculated to assert that the employer was reaping tremendous profits while treating its employees unfairly. As the majority notes, the document identified its source for the financial statement set forth therein as "Synalloy Corporation Six-Month Report to Stockholders." While this reference may indicate the origin of certain data, it far from explains its true meaning. Nothing in the document suggests that the profits figures themselves relate solely to Synalloy as opposed to its dye-making division (Blackman-Uhler).

The actual financial statement bears the title "Statement of Consolidated Earnings." Under generally accepted accounting principles, a "consolidated statement" reflects the financial status of a parent corporation and its subsidiaries. The majority therefore

1. The record is unclear as to whether Blackman-Uhler operates as a division or a subsidiary of Synalloy Corporation, but the distinction is irrelevant for purposes of this appeal. Although divisions are distinct from subsidiaries and are not the subject of "consolidated statements," counsel, in oral argument, indicated that Synalloy does have other corporate holdings which qualify as the latter. Accordingly, the "consolidated statement" reflects more than one corporate entity (a fact which the

correctly reasons that the profit could not possibly apply to Blackman-Uhler alone.[1] While an accountant, a tax expert and a sophisticated investor would probably draw this conclusion, it is sheer fantasy to expect the same analysis from the employees eligible to vote in this election.[2] There can be no doubt about the impact of this leaflet. The message intended and the message conveyed are one and the same: The profit "bonanza" and the "250% increase in Company profits" are attributable to one branch of Synalloy (the Blackman-Uhler plant) rather than the sum of its component parts.

### II.

The majority also suggests that two critical elements for the invalidation of any election have not been satisfied. A careful review of the record suggests an entirely opposite conclusion.

This Circuit recognizes a tri-partite test of union campaign rhetoric. An election will not be set aside unless "(1) there has been a material misrepresentation of fact, (2) the misrepresentation comes from a party who has special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election." *NLRB v. Santee River Wool Combing Co.,* 537 F.2d 1208, 1210 (4 Cir. 1976), quoting from *Celanese Corp. of America v. NLRB,* 291 F.2d 224, 226 (7 Cir.), cert. denied, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 189 (1961). *See NLRB v. Bata Shoe Co.,* 377 F.2d 821, 829 (4 Cir.), cert. denied, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967). The majority urges that the first two requirements have not been met.

majority relies upon but which would escape the average employee).

2. The employees eligible to vote were "[a]ll production and maintenance employees, including laboratory employees, truckdrivers, and plant clerical employees . . . excluding all office clerical employees, guards, professional employees and all supervisors as defined in the Act."

The opinion states that "while the leaflet may have been ambiguous or misleading, it was not of sufficient degree to constitute a *material* misrepresentation." At 707 (emphasis added). The leaflet deals with employee wages and the ability of Blackman-Uhler to furnish wage increases (as measured by its profit margin). The union suggests that current wages are "measley" while company profits (and payouts to shareholders) have reached "jackpot" proportions. The obvious implication is that management has engaged in virtual extortion and will continue to do so unless and until the union steps in.

It is difficult to conceive of a subject having greater impact on the majority of union elections. As noted by one court of appeals, "[W]ages [are], 'the stuff of life for Unions and members, the self-same subjects concerning which men organize and elect their representatives to bargain.'" *LaCrescent Constant Care Center, Inc. v. NLRB,* 510 F.2d 1319, 1322 (8 Cir. 1975), quoting from *NLRB v. Houston Chronicle Pub. Co.,* 300 F.2d 273, 280 (5 Cir. 1962). *See also Aircraft Radio Corp. (Div. of Cessna Aircraft Co.) v. NLRB,* 519 F.2d 590, 593–94 (3 Cir. 1975); *Argus Optics v. NLRB,* 515 F.2d 939, 944–45 (6 Cir. 1975); *NLRB v. G. K. Turner Associates,* 457 F.2d 484, 488 (9 Cir. 1972).

The opinion next maintains that "the union used no specific figures nor any specific information to show or to imply a *knowledge* on its part of Blackman—Uhler profits." At 707 (emphasis added). Our prior decisions do not require that the union reveal actual knowledge of the facts it misrepresents. Unfairness may ensue when the union is simply in "an authoritative position" to ascertain the truth while continuing to insist on false or deceptive declarations. *Santee River, supra,* at 1210. Here, there can be no question that union officials, conducting an election campaign, are ideally situated (and generally inclined) to scrutinize the employer's published financial statements. Certainly, their position is far superior to the average employee, upon whose "common sense" the majority relies:

> [A union business agent's] function, which is to organize and serve as liaison with management, requires him to learn as much as possible about the financial condition of the employer with whom he negotiates on behalf of its employees.
>
> . . .
>
> . . . Without casting any reflections upon the employees, . . . it strikes us as unreasonable to expect that they, . . . would have any knowledge as to the Company's profits, much less access to such information.

*Henderson Trumbull Supply Corp. v. NLRB,* 501 F.2d 1224, 1229–30 (2 Cir. 1974).[3]

### III.

Finally, the majority seeks to invoke the general rule that Board decisions are entitled to deference, especially when dealing with issues of campaign rhetoric. *NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 920 (5 Cir. 1976). While "laboratory conditions" may be unattainable in the real world of unionization efforts, this is not a case exhibiting the normal degree of "puffing and propagandizing" one must expect and tolerate. "[A] point may be reached where the pre-election propagandizing has created an atmosphere rendering the free choice of a bargaining agent by the employees highly improbable. In such event the election must be invalidated." *LaCrescent, supra,* at 1322. I believe that the critical point has been exceeded. The subject matter of the union handout must be recalled together with the timing of its distribution. In addition, the record reveals that the final election tally was extremely close.[4] When such a result ensues, the courts have taken a more critical view of misrepresentation, ei-

**3.** *Henderson* dealt with oral misrepresentations by a union business agent at a union meeting. However, the rationale expressed by the Second Circuit applies equally well in the present context.

**4.** The record indicates that the union was victorious by a vote of 58 to 50.

ther by the employer or by the union. *Aircraft Radio Corp. (Div. of Cessna Aircraft Co.) v. NLRB,* 519 F.2d 590, 594 (3 Cir. 1975); *Henderson Trumbull Supply Corp. v. NLRB,* 501 F.2d 1224, 1230 (2 Cir. 1974). Under this set of facts, it is reasonably predictable that the leaflet had a crucial (and undeserved) effect on the voting.

### IV.

Because of the aforementioned reasons, I would deny enforcement.