HANES CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Amalgamated Clothing and Textile Workers Union, AFL–CIO, CLC, Intervenor.

No. 81–1035.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1981.

Decided May 5, 1982.

Rehearing and Rehearing En Banc Denied June 8, 1982.

---

J. Hamilton Stewart, III, Washington, D. C. (Ogletree, Deakins, Nash, Smoak & Stewart, Washington, D. C., on brief), for petitioner.

David A. Fleischer, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Stephen Burrow, New York City, ACTWU, for intervenor.

Before WIDENER and MURNAGHAN, Circuit Judges, and BRITT, District Judge.*

WIDENER, Circuit Judge:

The intervenor, Amalgamated Clothing and Textile Workers Union, gained a majority of the votes cast in a November 21, 1979 representation election at the Hanes Corporation's Brooks plant in Galax, Virginia.[1] Hanes, however, refused to bargain with the Union, and, after customary proceedings, the Board issued an order requiring that the same be done. 254 NLRB No. 63 (1981). Hanes has petitioned this court for review of the NLRB's order, and the Board has cross-applied for enforcement.

Confronted by an array of objectionable communications, the number of which is unprecedented in our experience, we deny enforcement of the Board's order. To enforce the order would mock the Board's call in *General Shoe Corp.*, 77 NLRB 124 (1948), for "laboratory conditions"—circumstances "as nearly ideal as possible, [in which] to determine the uninhibited desires of the employees." *Id.* at 127. The Union's campaign in this case "lowered the standards of campaigning to the point where it may be said that the uninhibited desires of the employees [could not] be determined in an election." *Gummed Products Co.*, 112 NLRB 1092, 1094 (1955). While we are aware that the Board has wide discretion in such matters and that actual laboratory conditions frequently do not exist, *Schneider Mills, Inc. v. NLRB*, 390 F.2d 375, 378, 379 (4th Cir. 1968), to grant enforcement here would signal opposing parties in certification elections that we consider to be lawful the sort of campaign conducted by the Union in this case.

For the purpose of analysis, Hanes' complaints about the Union's campaign may be divided into two categories. First, Hanes asserts that the campaign literature assaults the honesty and integrity of the corporation's management and attorneys. It contends that the literature identified Hanes with its attorneys and impugned the character of the management by disparaging the attorneys. Furthermore, Hanes argues that the form and content of these attacks precluded an effective response. Second, Hanes asserts that through misstatements of the nature of federal labor law and other like implications contained in the campaign literature, the Union intimated that it had the previous approval and support of the federal government and the NLRB. The former argument is compelling, so we need not consider the latter.

---

* United States District Court for the Eastern District of North Carolina, sitting by designation.

1. The vote in the election was 569 for the Union and 504 against representation, with 50 ballots challenged. The challenged votes were not tallied as they would not have affected the outcome. The Union thus had 50.7% of the votes cast, and 53.0% of the votes counted.

On October 10, 1979, the day after the petition for an election was filed, the Union began its campaign against the Company's attorneys (and thus against the Company) with a handbill stating that the Company's communications to the employees in the course of the campaign would be written by the Company's lawyers.

That the campaign would be run by the lawyers was made abundantly clear as the following brief excerpts from the Union's letters, leaflets, etc. will demonstrate:

October 10, 1979—

"The Company will hire a [sic] anti-union Law firm to try and frighten you into continuing working for starvation wages on inhuman work assignments. These Lawyers will write you long love letters with the Company name signed to them telling you how much the Company loves you . . . ."

October 18, 1979—

"You will be called together in meetings. The company officials will stand before you at these meetings and read the speeches written by the company's million dollar attorneys."

October 25, 1979—

"The company officials will be reading to the employees anti-union speeches. The speeches will have been written by the company's high priced million dollar anti-union lawyers."

November 1, 1979—

"All the speeches the Company will be reading to you will be written by his [sic] bunch of shysters. The Company letters you are now receiving with a Company official's name signed to the letters were written by these shysters."

November 8, 1979—

"Topsy, the Company official who gave us that speech was just a Polly Parrot for the South Carolina law firm that Hanes has hired to lie and deceive us into voting against ourselves. Everything the Company official told us that insulted and degraded our intelligence was written and filmed by the shyster lawyers from South Carolina."

November 8, 1979—

"These lawyers will write the letter for the Company that you will be receiving with a Company official's name signed to the letter."

November 8, 1979—

"The Company has hired a law firm from Greenville, South Carolina which will be paid by the Company to do the following: (Paraphrased) Spread rumors of plant closing, cutting of wages and fringe benefits; place lies and propaganda on the bulletin board which will be kept locked up behind glass plates in violation of federal law; write letters for Company officials' signatures and the speeches the Company officials will be reading; spread rumors that the Company will know who signed union cards and how employees vote in the election; spread rumors that workers' tires have been slashed and that the workers have been on angel dust and other dope.

November 14, 1979—

"The union guarantees that every letter you have received or will continue to receive until the election is over with, have been written by the attorneys hired by the company . . . . The union guarantees that all the company speeches and all of that junk on the company bulletin boards against working people was conceived and written by the law firm in South Carolina."

November 16, 1979—

"The South Carolina attorneys, have been hired by Hanes to brain wash you into voting against yourselves and your families."

Comingled with the expressed theme that all the Company's communications, and indeed its campaign, was in charge of the Company's attorneys, the Union letters, leaflets, etc. proceeded with a wholly uncalled for false and inflammatory attack on the lawyers' character, as is demonstrated below:

October 18, 1979—

"Southern Textile Companies pay these anti-union lawyers millions of dollars to write filth against the union that insults and degrades the intelligence of a moran [sic]."

October 25, 1979—

"The speeches will have been written by the company's high priced million dollar anti-union lawyers. These lawyers earn their depraved uncivilized, unamerican huge salaries, destroying the will of working people to help themselves. These anti-union lawyers, through deceit and propaganda have made industrial slaves of textile workers in the South."

## "COMPANY MILLION DOLLAR SHYSTER LAWYER'S BOLOGNA

"This is the bologna the shyster lawyers will be writing for the officials."

November 1, 1979—

## "SOUTH CAROLINA SHYSTER LAWYERS

"Hanes went all the way to Greenville, South Carolina to hire a law firm of shyster lawyers. These shyster lawyers earn their depraved, Unamerican living destroying southern textile workers. No group of people on this earth have done more to keep southern textile workers as industrial slaves as the bunch of shyster lawyers. All the speeches the Company will be reading to you will be written by his [sic] bunch of shysters. The Company letters you are now receiving with a Company official's name signed to the letters were written by these shysters. All of the tons of filth and hate you will see and read on the Company bulletin board came from these shysters.

"The shyster lawyers will have brown nosers going through the plant telling you that someone tore their car up. [Also that paint was scratched off cars, tires slashed, someone gave workers angel dust or some other form of dope]. The shyster lawyers don't have the courage or the common decency to stand before you in the presence of a union representative and utter one word of untruth against the Union."

November 1, 1979—

"Topsy, the Company official who gave us that speech was just a Polly Parrot for the South Carolina law firm that Hanes has hired to lie and deceive us into voting against ourselves. Everything the Company official told us that insulted and degraded our intelligence was written and filmed by the shyster lawyers from South Carolina. Hanes is paying these shysters thousands of dollars to lie, insult and try to frighten us out of voting for the Union. The shyster attorneys that Hanes have hired are the same ones who represent J. P. Stevens and have been declared the worse violators of workers rights in this Nation. J. P. Stevens has had to pay millions of dollars in back wages to Stevens workers for violating their rights. Each time Stevens violates a workers rights the Union goes before Federal Authorities to compel Stevens to make whole any losses that the worker was deprived of. Companies violate the law and the Union sees that the violators are punished. Companies who hire these shyster lawyers hire them to violate the workers rights and not to protect the workers rights. This bunch of South Carolina shysters recently represented Burlington in Kerneysville, [sic] North Carolina. They carried on the same filthy, degrading, unlawful tactics at the Burlington plant that they are carrying on at the Hanes, Galax plant. The Federal Government, due to these violations, has ordered Burlington Mills to bargain with the employees on the Union contract. This same bunch of shysters represented a Company in Wallace, North Carolina. The violation of workers rights was so cruel that the Federal Government declared that the Company in Wallace must do the following:

1. Pay the Union for all expenses incurred in organizing the workers.

2. Pay the Union for all expenses that occurred to protect the workers rights as guaranteed by federal law, and to bargain with employees on a Union contract.

"The Hanes dyeing and finishing employees in Winston-Salem, North Carolina laughed and made fun of the lies that were told by the bunch of shysters.... It's amazing isn't it Topsy, the Company hired shysters to violate the laws and throws up a smoke stream to try and cover up for the laws which the shysters violate."

November 16, 1979—

"On Monday November 19, 1978, you will be called into captive audience meetings. You will be brain washed. . . . The South Carolina Attorneys, have been hired by Hanes to brain wash you into voting against yourselves and your families.

"The people of Russia, China, Cuba and the other communist nations, are also compelled to attend brain washing sessions. There is no difference in their brain washing sessions than in your brain washing sessions."

November 16, 1979—

"The Company and this law firm vilolate [sic] the laws and then say the union is the trouble maker. The criminal calling the innocent the crook."

 In this circuit, *NLRB v. Santee River Wool Combing Co.*, 537 F.2d 1208 (4th Cir. 1976), governs representation election conduct. There, we said: "[a]n election will be set aside only where (1) there has been a material misrepresentation of facts, (2) this misrepresentation comes from a party who has special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election." *Id.* at 1210; accord, *Collins & Aikman v. NLRB*, 383 F.2d 722, 727 (4th Cir. 1967); *NLRB v. Bata Shoe Corp.*, 377 F.2d 821 (4th Cir.), cert. denied, 389 U.S. 917, 88 S.Ct. 247, 19 L.Ed.2d 273 (1967). See also *Hollywood Ceramics Co.*, 140 NLRB 221 (1962).[2] If all three elements of this test are present, it is presumed that the misrepresentation had a substantial impact on the election. See *Santee River*, 537 F.2d at 1212.[3] The Union's attacks on the management must be evaluated "against the

entire pattern of circumstances attending the election." *Sewell Manufacturing Co.*, 138 NLRB 66, 69 n. 4 (1962); accord, *General Industries Electronics Co.*, 146 NLRB 1139, 1141 (1964); see *Daniel Construction Co. v. NLRB*, 341 F.2d 805, 811 (4th Cir. 1965). Because neither the Board nor the Union have offered proof that the allegations concerning Hanes and its attorneys were true, we must assume them to be false,[4] and, in all events, the Board in argument has conceded that "as far as we know the Company attorneys are perfectly ethical."

 We think the elements of the *Santee River* test have been met in this case.

First, the Union's misrepresentations concerning Hanes and its attorneys certainly were material to the election. The Union's unbridled attacks on Hanes and the attorneys included and concerned in their substance (as the Company's communications obviously had) the vital matters of wages, hours, and working conditions so that ". . . they must have had a significant impact on the employees causing them to adhere to [the Union] for protection." *Santee River*, 537 F.2d at 1211, quoting *Weslock*, 199 NLRB 549, 550 (1972).

Turning to the second aspect of the *Santee River* test, it is also apparent that the Union was in a position to have knowledge as to the facts pertaining to Hanes' attorneys involved in this case. Not only had the Union had numerous contacts with the law firm in question as is shown in the reported decisions,[5] one of the leaflets here distributed by the Union to the employees specifically mentions and criticizes the at-

---

**2.** *Hollywood Ceramics* was modified by *Shopping Kart Market, Inc.*, 228 NLRB No. 190 (1977), which was then overruled by *General Knit, Inc.*, 239 NLRB No. 101 (1978), leaving the rule of *Hollywood Ceramics* the present rule of decision.

**3.** This court has rejected the argument that parties objecting to certain campaign material must demonstrate that the material had a substantial impact on the election. *Santee River*, 537 F.2d at 1212.

**4.** *Schneider Mills* at p. 377.

**5.** E.g., *J. P. Stevens & Co. (Rocky Mount) v. NLRB*, 638 F.2d 676 (4th Cir. 1980); *J. P. Stevens & Co. (Roanoke Rapids)*, 623 F.2d 322 (4th Cir. 1980); *J. P. Stevens & Co. (Tifton) v. NLRB*, 612 F.2d 881 (4th Cir. 1980); *J. P. Stevens & Co. v. NLRB*, 592 F.2d 1237 (4th Cir. 1979); *Amalgamated Clothing & Textile Workers Union v. Standard-Coosa-Thatcher Carpet Yard Div., Inc.*, 516 F.Supp. 1078 (N.D.Ala., 1981); *Burlington Industries, Inc., Kernersville Finishing Plant*, 257 NLRB No. 98 (1981), reprinted in 1979–80 CCH NLRB ¶ 16,143.

torneys' involvement in certain cases in Wallace, North Carolina (Stevens) and Kernersville, North Carolina (Burlington), reported as *Burlington Industries, Inc., Kernersville Finishing Plant*, 257 NLRB No. 98 (1981), reprinted in 1981–82 CCH NLRB ¶ 18,315; *J. P. Stevens & Co.*, 244 NLRB No. 82 (1979), reprinted in 1979–80 CCH NLRB ¶ 16,143, enforcement granted, 668 F.2d 767 (4th Cir. 1982). In the *Burlington* case, in which the Union was admittedly involved, it accused the attorneys of carrying on "... the same filthy, degrading, unlawful tactics at the Burlington plant that they are carrying on at the Hanes, Galax plant." The leaflet went on: "The Federal Government, due to these violations, has ordered Burlington Mills to bargain with the employees on the Union contract." This last statement is untrue, and the Union was in a position to know it was untrue at the time it was made because of its involvement in the case. While a bargaining order later did issue, the case was not even decided by the Administrative Law Judge until October 1980, about a year *after* the statement was made by the Union, or by the NLRB until August 1981, almost two years later.

With respect to the *Stevens* case, again in which the Union was admittedly involved, the attorneys tell us that they did not even represent Stevens at the time involved in which "[t]he principal issues relate to the time frame—September 1974 through February 19, 1975," 244 NLRB at 413. This assertion is undisputed either by the Board or by the Union, both of which are bound to have in their possession the records of that proceeding. The accusation with respect to the *Stevens* case was that "The shyster attorneys that Hanes have hired are the same ones who represent J. P. Stevens and have been declared thw [sic] worse violators fo [sic] workers rights in this nation.... The violation of workers rights was so cruel that the Federal Government declared that the company in Wallace must do the following [pay the Union for all expenses incurred in organizing, protecting the workers rights

and bargaining]." Again, the statement of the involvement of the attorneys is untrue, and the Union was in a position to know it was untrue at the time the statement was made.[6]

As we noted in *Santee River* at p. 1211, "It is the *apparent* correctness of a statement which must be considered in determining its effect upon the voters ..." 537 F.2d at p. 1211. In addition to the very repetition of the theme that the lawyers were conducting Hanes' campaign and the reliance by the Union on the *Burlington* and *Stevens* cases we have just discussed, the Union took pains to guarantee, as we have mentioned before, in its leaflet of November 14, 1979, the lawyers' connection with the campaign: "The Union guarantees that every letter you have received or will continue to receive until the election is over with, have been written by the attorneys.... The Union guarantees that all the company speeches and all of that junk on the company bulletin boards ... was conceived and written by the law firm in South Carolina."

The association of the Union with the law firm, its admitted involvement in the *Burlington* and *Stevens* cases, and its repeated written assertions, with even a guarantee, that the attorneys were conducting the campaign, we think are more than sufficient to satisfy the *Santee River* requirement of having special knowledge or being in an authoritative position to know the true facts.

Finally, the nature of the charges made it impossible for the employer to fully refute the material, the third *Santee River* issue. Papers attacking the company and its attorneys were distributed from shortly after the election petition was filed until shortly before the election. While there may be some issue as to exactly when the employees received certain pieces of literature, merely because the employer may have had time to reply to the charges does not mean that the *Santee River* test has

---

**6.** At this particular point in the proceeding, we are concerned more with showing the involvement of the Union with the attorneys, thus its

position to know, than with the truth of the statement.

been satisfied. If the nature of the charges are such as to make a reply ineffective, then no amount of time to reply can cure the problem. See *Schneider*, 390 F.2d at 380. In the instant case, the only practical way to reply to a charge of being a shyster is to answer that one is not a shyster. Such a response to an inflammatory accusation repeated time after time is probably as damning as the original accusation.

Having determined that the three requirements of the *Santee River* test have been met, we conclude that the attacks on the attorneys and thus on Hanes' management are the sort of " . . . inflammatory statements which create conditions which make impossible a sober, informed exercise of the franchise . . . ." *Schneider Mills* at 380. The characterization of the attorneys as shysters and worse is admittedly false. If the attorneys in fact wrote the speeches and written communications of the Company during the election, that makes matters worse for the Union rather than better, for not a word of any Company communication during the election is objected to, nor is any relied upon as calling for a reply. The idea that they were composed, and the campaign conducted, wholly by shyster lawyers as the Union has repeated time and again is simply not conduct which we may approve as permissible in a representation election. We have quoted only small parts of the more relevant communications. The number of untrue statements exceeds any which we have seen, and in virulence have few equals. This court noted and condemned for example, in *Schneider Mills*, the practice of comparing the owner of that company to Hitler. The Union's comparison in this case of the Company to the communist regimes in Russia, China, and elsewhere is no less offensive. We also think the fact that at least a part of the untruths may have been deliberate should be mentioned and is of some consequence. " 'An innocent mistake might occur for a number of reasons. One must regard deliberateness as an admission that the matter was important.' " *Santee River* at 1211. The same may be said of the repetition of such statements.

The extent of the impermissible campaigning by the Union convinces us that a sober, informed exercise of the franchise was not obtained in this election.

ENFORCEMENT DENIED.